J-A20018-22

2023 PA Super 257

| | |
|---|---|
| SAMUEL GARCED AND GLADYS DELGADO-GARCED | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellants | |
| v. | |
| UNITED CEREBRAL PALSY OF PHILADELPHIA AND VICINITY A/K/A BLOSSOM PHILADELPHIA AND SANOSIL USA, LLC AND SANOSIL INTERNATIONAL, LLC AND HALOSIL INTERNATIONAL, LLC | |
| Appellees | No. 111 EDA 2022 |

Appeal from the Order Entered December 7, 2021
In the Court of Common Pleas of Philadelphia County
Civil Division at No.: 171003536

BEFORE: STABILE, J., MCCAFFERY, J. and PELLEGRINI, J.[*]

OPINION BY STABILE, J.: **FILED DECEMBER 7, 2023**

In this civil action, Appellants Samuel Garced ("Mr. Garced") and Gladys Delgado-Garced ("Mrs. Garced") allege that Mr. Garced suffered injuries from exposure to a disinfectant cleaner known as HaloSpray manufactured by Appellee Halosil International, Inc.[1] that was applied to a sealed room by employees of Appellee United Cerebral Palsy of Philadelphia ("UCP") using a "fogger" provided by Halosil. Mr. Garced claimed that he suffered permanent lung damage by inhaling HaloSpray fog that escaped through gaps between

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] Appellees Halosil International, Inc., Sanosil USA, LLC and Sanosil International, LLC fall under the same corporate umbrella. We refer collectively to these appellees as "Halosil."

the sealed room and an adjacent room where he was cleaning. A jury awarded Mr. Garced $500,000.00 in damages for future medical expenses and $500,000.00 for past and future noneconomic loss but awarded no damages as to past lost earnings or future lost earning capacity. The trial court granted Halosil's and UCP's motions for judgment notwithstanding the verdict ("JNOV") on Mr. Garced's future medical expenses and future noneconomic loss based upon a failure to establish causation through competent expert testimony. The court denied Halosil's motion seeking JNOV on the ground that Appellants' action was preempted under the Federal Insecticide Fungicide Rodenticide Act ("FIFRA"), 7 U.S.C. § 136(v). The court ordered a new trial limited to the amount of past noneconomic loss related to Mr. Garced's emergency room visits and follow-up treatment. Sanctions also were ordered as against Appellants and their counsel for conduct relating to the use of an interpreter at trial. Appellants appeal from the order disposing of post-trial motions. We affirm.

## I. BACKGROUND FACTS AND APPEAL ISSUES.

The record reflects that HaloSpray consists of 94.5% deionized water, hydrogen peroxide, silver nitrate and phosphoric acid. Halosil, the manufacturer and seller of HaloSpray, provided a fogging machine (known as a HaloFogger) and bottles of HaloSpray to UCP. David St. Clair of Halosil trained Pat Bonner, head of UCP's maintenance department, how to use the HaloFogger to generate disinfectant fog from HaloSpray and how to train other UCP employees to use the HaloFogger and prepare rooms for fogging. St.

Clair also trained another UCP employee, Jason Benson. St. Clair instructed that safe fogging requires closing all doors, sealing all gaps between the doors and door jambs and floors with masking tape, sealing all air vents and placing caution signs on exit doors to keep people out. St. Clair advised that nobody should enter a room that is being fogged without PPE (a respirator and goggles), and people without PPE should stay out until the next morning so that the hydrogen peroxide in the fog could dissipate.

UCP contracted with Mr. Garced to provide general cleaning services at UCP. On May 26, 2016, Mr. Garced was exposed to HaloSpray at UCP's Philadelphia facility. On that date, Mr. and Mrs. Garced were providing cleaning services at UCP. When they arrived that day, they were told not to clean Room 166 that evening. Benson set up the HaloFogger in Room 166, sealed the room and left the building at around 8:30 to 8:45 p.m. Mr. Garced testified that he was mopping and sweeping the floor of the classroom adjacent to Room 166 when he began feeling symptoms in his nose, face and chest. He testified that he had been working for about twenty minutes in the room before noticing fog or smoke around him. When he looked up and saw smoke on the ceiling, he exited the room. In the hallway, his face was bright red, and he threw up a white substance. Mrs. Garced testified that the bathroom doors leading into Room 166 and the connecting room where Mr. Garced was working were both open at the time of the incident.

Appellants left UCP and drove to nearby Einstein hospital because Mr. Garced was suffering from coughing and burning. He received oxygen in the

emergency room and reported chest pain and tightness. He claimed to never have had respiratory problems before the incident at UCP. Following the exposure incident, he related he had shortness of breath, coughing, pain in his chest, left-sided sinus pain and swelling.

In mid-August 2016, three months after the incident at UCP, Mr. Garced was diagnosed with irritant induced asthma or reactive airway disease syndrome ("RADS"). He later underwent sinus surgery, and he stopped working in 2019.

Appellants filed a personal injury action raising negligence claims against all Appellees as well as product liability and breach of warranty claims against Halosil. Appellants also named St. Clair as a defendant but later agreed to dismiss their claim against him. The court granted summary judgment in favor of Halosil on the product liability and warranty claims but permitted the case to proceed to trial on Appellants' negligence claim.

Several weeks before trial, the parties filed a total of 24 motions *in limine*, including Halosil's **Frye**[2] motion to preclude the testimony of Appellants' medical expert witnesses, Drs. Lazaar and Savul, on the ground that the methodology underlying their opinions was not generally accepted in the relevant scientific community. UCP subsequently joined in this motion. One day before trial, the case was reassigned from the Honorable Sean Kennedy to the Honorable James Crumlish, III. On the morning of trial, the

_____

[2] **Frye v. United States**, 293 F. 1013 (D.C. Cir. 1923).

parties argued the motions *in limine* before Judge Crumlish. Without holding an evidentiary hearing, Judge Crumlish denied the **Frye** motion without prejudice to Appellees' right to renew their objections to the medical experts' testimony during trial. N.T., 9/28/21, at 29.

The case proceeded to trial before Judge Crumlish. Appellants contended that Halosil was negligent in teaching UCP employees and in failing to identify places where the fog could escape and injure bystanders. Appellants asserted that UCP's employees were negligent in failing to seal the room it was fogging. Drs. Lazaar and Savul testified that Mr. Garced's exposure to HaloSpray was the cause of his RADS. Notably, Appellants did not present any testimony, expert or otherwise, concerning the concentration of fog in the room where Mr. Garced experienced symptoms, a calculation of the dosage of HaloSpray that he inhaled, or the concentration of the mist in the room that would have been sufficient to cause RADS.

Mr. Garced required an interpreter for his testimony because his primary language is Spanish. After trial began, Appellees learned that Appellants and their counsel met with their interpreter before and during trial to discuss Mr. Garced's testimony. Appellees immediately moved for a directed verdict on the ground that Appellants and their counsel improperly coached the interpreter. The court denied this motion without prejudice to Appellees' right to raise the same motion at the conclusion of trial.

At the close of Appellants' case, the court entered a nonsuit against Mrs. Garced. It previously granted Appellees' motion in limine to preclude her

personal injury claim for failure to provide an expert report that causally connected her claimed injury to the exposure incident. At the close of evidence, Appellees again moved for a directed verdict based on Appellants' misconduct relating to the interpreter. Appellees also moved for a directed verdict on the ground that Appellants failed to present sufficient evidence in support of the causation element of their negligence claim. Finally, Halosil moved for a directed verdict on the ground that Appellants' claims were preempted under FIFRA. The court denied all motions for directed verdict.

On October 7, 2021, the jury returned a verdict in favor of Mr. Garced in the amount of $1,000,000.00, finding UCP eighty percent (80%) liable and Halosil twenty percent (20%) liable. The verdict sheet reflected awards of $500,000.00 for "future medical expenses" and $500,000.00 for "past, present, and future pain and suffering, embarrassment and humiliation and loss of enjoyment of life." All parties filed post-trial motions. On December 7, 2021, the court entered an order denying Appellants' post-trial motions as well as Halosil's motion for JNOV under FIFRA. The court granted Halosil's and UCP's motions for JNOV for Appellants' failure to submit sufficient evidence of causation. The court concluded that Appellants' experts failed to meet the **Frye** and Rule 702[3] standard for opining on proximate cause to support future medical expenses and future noneconomic loss, and that the jury therefore had no valid basis for these awards. Accordingly, the court

---

[3] Pa.R.E 702 – Testimony by Expert Witnesses.

vacated the jury's verdict and ordered a new trial limited solely to the issue of any past noneconomic loss that Mr. Garced could recover related to his initial emergency room visit and its immediate aftermath, which in the court's opinion, represented the only injury for which Mr. Garced had admissible medical opinions to establish causation in fact. Consequently, the court struck the award of future medical expenses and future noneconomic loss,[4] and granted a new trial limited to the amount of past noneconomic loss related to Mr. Garced's emergency room visits and follow-up treatment. The court denied UCP's motion for JNOV based on Appellants' misconduct during trial relating to the interpreter for Mr. Garced's testimony. The court did, however, in granting a new trial, grant relief on the issue of this misconduct, providing:

> [In the new trial,] the Court's prior preclusions of evidence are imposed as the law of the case, the Jury's determination that [Mr. Garced] failed to prove any damages based upon lost income is binding, [Appellants'] experts are PRECLUDED from offering testimony as to any current or future medical conditions, [Mrs.] Garced is PRECLUDED from bringing claims on her own behalf and [Mr. Garced] must produce his complete tax returns or suffer dismissal of his case.

---

[4] The court was clear both in its opinion and in its "Final Order" that it was striking the jury's award for future medical costs and future noneconomic damages. The court order, however, elsewhere stated that it was striking only the award of future medical expenses and granting a new trial as to past noneconomic loss only. Despite this part of the order striking only future medical expenses, we think it clear this was an oversight to not also include the striking of future noneconomic loss, as the court's order, its opinion, and its grant of a new trial limited solely to past noneconomic loss, definitively establish that its order included the striking of both future medical costs and future noneconomic loss. None of the parties to this appeal challenge this oversight.

Order, 12/7/21, at 2. The court further imposed two sanctions: an order requiring Appellants' counsel to pay $5,000.00, and an order directing Appellants[5] to pay counsel fees to Appellees relating to litigation concerning the interpreter.[6]

_____

[5] We also note some confusion as to who is responsible for paying counsel fees with respect to litigation concerning the interpreter. In its opinion, the court determined that an award against "Plaintiff [Mr. Garced] and Mrs. Garced" for their participation in the conduct surrounding the interpreter warranted the further sanction of counsel fees. Trial Court Opinion 12/7/21 at 27. The court's Final Order of that same date, however, directs that the misconduct of "Plaintiff, Gladys Garced and *their* counsel warrants the imposition of sanctions" such that "Plaintiff shall pay attorneys fees to the Defendants for their time in conducting the deposition of the interpreter…." Trial Court Final Order 12/7/21 at 3. (Emphasis added). Once again, we think it clear that the imposition of sanctions for these fees was against both Mr. and Mrs. Garced, as evidenced by the court's opinion and its reference to "their" counsel in its final order. Should any confusion persist, Appellants may seek clarification from the trial court upon remand.

[6] The court instructed Appellees to file motions substantiating the amount of their counsel fees and that it would schedule a hearing on Appellees' application for attorney's fees. The lower court docket reflects that the attorney's fee issue against Appellants remains pending in the trial court; there have not been any further filings or rulings on this issue. We observe the fact that litigation remains pending over the amount of counsel fees as a sanction against Appellants under 42 Pa.C.S.A. § 2503, does not defeat our jurisdiction over this appeal. As the Commonwealth Court has observed:

> A motion for counsel fees under 42 Pa.C.S.[A.] § 2503 is an ancillary matter separate from the appeal of the trial court's judgment in the case. *Samuel–Bassett v. Kia Motors America, Inc.,* [] 34 A.3d 1, 48 ([Pa.] 2011); *Old Forge School District v. Highmark Inc.,* [] 924 A.2d 1205, 1211 ([Pa.] 2007). The filing of an appeal therefore does not divest the trial court of jurisdiction over such a motion for counsel fees. *Samuel–*

*(Footnote Continued Next Page)*

On December 15, 2021, Appellants filed a notice of appeal from the order deciding post-trial motions. Both Appellants and the trial court complied with Pa.R.A.P. 1925. Appellees did not file cross-appeals. Appellants raise the following issues in this appeal, which we re-order to accommodate the order in which we shall address the issues:

> 1. Did the trial court err in granting [Appellees'] Motion for JNOV where the evidence viewed in the light most favorable to [Appellants] was sufficient as a matter of law to support a causal nexus between [Appellees'] negligence and the injuries?
>
> 2. Did the trial court err and abuse its discretion in granting [Appellees'] Motion for New Trial and at the same time punishing [Appellants] and [Appellants'] counsel for alleged vexatious conduct by "gutting" their case and ordering sanctions against them where there was no evidence that the [Appellants] or [Appellants'] counsel deliberately violated a clear order of the Court, and there was no evidence that any alleged vexatious conduct affected the outcome of the trial?
>
> 3. Did the trial court err in denying [Appellants'] Motion for a New Trial on the issue of damages where income tax consequences were brought into the trial; [Appellants were] limited to ten minutes for testimony on damages; evidence was introduced as to what was paid for past medical bills in violation of the collateral source rule; the defense expert was permitted to testify that the use of Xolair [a drug that Mr. Garced received as part of his medical treatment] beyond four months was inappropriate though not part of his pretrial report; [Appellants were] precluded from arguing that [Mr. Garced's] work at UCP did not continue as a consequence of this accident; the trial court gave a prejudicial

---

*Bassett,* 34 A.3d at 48; *Old Forge School District,* 924 A.2d at 1211.

*Ness v. York Tp. Bd. Of Com'rs*, 123 A.3d 1166, 1170 (Pa. Cmwlth. 2015). Commonwealth Court decisions do not bind this Court, but we may consider them as persuasive authority. *Petow v. Warehime*, 996 A.2d 1083, 1189 n.1 (Pa. Super. 2010).

curative instruction; and [Appellants were] precluded from introducing a videotape to rebut surveillance video that had just been provided by [Appellees]?

4. Did the trial court err in precluding [Appellants'] liability expert from testifying because he was an alleged competitor of the defendant?

Appellants' Brief at 5-6.

## II. JNOV AND CAUSATION

When reviewing an order resolving a post-trial motion for JNOV, our standard of review is as follows:

> A judgment notwithstanding the verdict can be entered upon two bases: (1) where the movant is entitled to judgment as a matter of law; and/or, (2) the evidence was such that no two reasonable minds could disagree that the verdict should have been rendered for the movant. When reviewing a trial court's denial of a motion for judgment notwithstanding the verdict, we must consider all of the evidence admitted to decide if there was sufficient competent evidence to sustain the verdict. In so doing, we must also view this evidence in the light most favorable to the verdict winner, giving the victorious party the benefit of every reasonable inference arising from the evidence and rejecting all unfavorable testimony and inference. Concerning any questions of law, our scope of review is plenary. Concerning questions of credibility and weight accorded the evidence at trial, we will not substitute our judgment for that of the finder of fact. If any basis exists upon which the [trial] court could have properly made its award, then we must affirm the trial court's denial of the motion for judgment notwithstanding the verdict. A judgment notwithstanding the verdict should be entered only in a clear case.

**Karden Constr. Servs., Inc. v. D'Amico**, 219 A.3d 619, 627 (Pa. Super. 2019).

In their post-trial motions, Appellees sought JNOV based on Appellants' failure to present sufficient evidence at trial to establish the necessary nexus between Mr. Garced's initial exposure to HaloSpray and his long-term chronic

- 10 -

respiratory illness, RADS. Appellees focus on two flaws in Appellants' evidence: (1) Appellants failed to establish any level or concentration of exposure to HaloSpray at the time of the May 26, 2016 incident, and (2) Appellants' medical experts failed entirely to set forth any scientific authority or empirical studies to support their opinions on causation. The trial court agreed and granted JNOV on all of Appellants' future economic and non-economic claims for damages. On appeal, Appellants argue that neither of their experts had to testify that a particular concentration of HaloSpray had to be identified to render a diagnosis of RADS or chronic sinusitis or to casually connect exposure to their diagnoses. Appellants' Brief at 48. They argue instead that their evidence was sufficient because it is known that HaloSpray is an irritant, their expert testimony established that exposure for up to 20 minutes[7] was a significant exposure, and Mr. Garced developed respiratory problems from exposure to the HaloSpray irritant. *Id.* at 48-49. They claim an exact concentration of the irritant is not required if the patient meets the scientifically and medically accepted criteria; that is, Mr. Garced had no prior respiratory symptoms,[8] the product is confirmed to be an irritant, other causes

---

[7] Appellees contend that the evidence shows Mr. Garced was only in the room for several minutes, but for purposes of this JNOV issue, we will accept as true Mr. Garced's claim that he was in the room for twenty minutes.

[8] A statement that is belied by the record, as demonstrated below.

- 11 -

are ruled out, and the diagnosis is confirmed through methacholine challenge testing.  *Id.* at 49.

In granting JNOV, the trial court observed that "[i]t was more than sufficient as a matter of fact for the jury to conclude that [Mr. Garced] suffered an injury of undefined severity on May 26, 2016 that caused him to seek treatment to the emergency room.  However, the evidence demonstrated that any effects suffered from exposure to Halospray at UCP resolved within several months and [Appellant's] lung function showed no continuing injury."  Memorandum Opinion, 12/7/21, at 4.  Citing *Estate of Walsh v. BASF Corp.*, 234 A.3d 446, (Pa. 2020), which in turn relied upon *Frye,* the court held that to attempt to legally and factually connect the claimed continuing injuries back to the UCP exposure, Appellants needed to offer a timely pre-trial expert opinion and competent and admissible expert testimony at trial based upon an accepted scientific methodology that causally connected Mr. Garced's alleged ongoing medical condition to the Halospray exposure.  Memorandum Opinion at 4.  The trial court concluded that Appellants' expert testimony failed to demonstrate a causal nexus between the incident at UCP and Mr. Garced's future economic loss and future medical expenses:

> [Appellants'] experts only referenced two sources to support their conclusion—a Material Data Safety Sheet for Halomist (not the applicable Halospray) and an EPA document dealing with a 90% Hydrogen Peroxide solution. [Appellants'] counsel here extensively asked witnesses about Halomist, not the product involved in [Mr. Garced's] exposure (Halospray).  The experts made no separate scientific investigation as to Halospray and never did any testing or calculations to determine exposure levels,

airborne properties or experimental evidence from human populations. No evidence was offered as to the effect of Halospray on human subjects, exposure times or latent injury. Not a single treatise, textbook or scientific article was consulted or cited. The EPA warnings on the 90% product bear no relationship to Halospray, which contained a dramatically different concentration and application and had no more than 5% hydrogen peroxide. Thus, . . . [Appellants'] experts failed to offer any scientific methodology for their conclusions that [Appellant] Garced's current lung problems resulted from a brief exposure in 2016 to Halospray. Halosil's assertion of a deficiency in expert testimony supporting a case in fact and proof as to causation of [Mr. Garced's] alleged brief exposure to Halospray is correct. [Appellants] did not produce any supporting testimony of an expert toxicologist or industrial hygienist. (N.T. 9/29/21 p.m., pp. 47-49). [Appellants] did not have an expert who measured the contents of the "mist" or the amount of potentially hazardous material in it. [Appellants] simply had [their] experts parrot lay beliefs based upon [Appellants'] version of the event—*i.e.*, not one expert or scientist did any testing on the product to determine a concentration in the air either in the room where the fogging occurred or as to the ability of the "fog" to migrate from the sealed room to the location where Mr. Garced claimed to have been exposed (counsel admitted that the opinion given relied wholly on the subjective "history", not on any scientific assessment of exposure. N.T. 9/29/21 p.m., p. 98, lines 15-18; see also, N.T. 9/29/21 p.m., p. 110, lines 12-20). Clearly, there was no admissible scientific foundation or basis sufficient to present to the jury to support the conclusion that an exposure to Halospray of a kind causing permanent injury had occurred. The entirety of the experts' conclusions depended upon Mr. Garced's self-serving narrative. . . . Furthermore, there was no evidence as to the concentration level of any material that composed the Halospray or how many parts of any specific chemical were in the "fog" that allegedly migrated to an entirely different room at UCP where Mr. Garced claimed to have been exposed.

*Id.* at 6-8 (emphasis added).

In arriving at its determination that Appellants failed to present competent expert testimony, the trial court also found this Court's analysis in

*Sniavich v. Rohm & Haas*, 83 A.3d 191 (Pa. Super. 2013), "instructive." *Id.*

at 6. The court stated:

> [*Sniavich*] involved a claimed injury arising from chemical exposure. In *Sniavich*, Plaintiff sought to relate her deceased husband's brain cancer to chemical exposures at his work. However, the expert concluded a proximal relationship solely on the basis of the diagnosis along with work history and work conditions analyzed through the expert's experience in occupational medicine. The court found that the opinion lacked any scientific authority—facts, testimony, or empirical data. The court outlined the foundation required as follows:
>
> > The exercise of scientific expertise requires inclusion of scientific authority and application of the authority to the specific facts at hand. Thus, the minimal threshold that expert testimony must meet to qualify as an expert opinion rather than merely an opinion expressed by an expert, is this: the proffered expert testimony must point to, rely on or cite some scientific authority—whether facts, empirical studies, or the expert's own research—that the expert has applied to the facts at hand and which supports the expert's ultimate conclusion. When an expert opinion fails to include such authority, the trial court has no choice but to conclude that the expert opinion reflects nothing more than mere personal belief.
>
> 83 A.3d at 197. Instead, the Court concluded that Plaintiff's expert report could "be aptly described as 'scrupulously avoid[ing] the medical literature,' and based 'entirely on subjective assessments of both cause and effect,' as it does not include any `research, conducted by [the plaintiff's expert] or anyone else, to support [his] assertion[ ] on causation.'" *Id.*, citing *Checchio v. Frankford Hospital-Torresdale Division*, 717 A2d 1058, 1062 (Pa. Super. 1998).

*Id.* at 6.

We concur with the trial court's conclusion that Appellant's failed to

establish a causal connection between Mr. Garced's initial exposure to

HaloSpray on May 26, 2016, and his subsequent development of RADS.[9] Essentially, Appellants' experts simply gave their own opinions that Mr. Garced developed RADS due to an initial exposure of a known irritant, and that based upon a reported history of no prior respiratory problems, that his current diagnosis of RADS, as diagnosed through testing, was due to the HaloSpray exposure. This was insufficient. Appellants failed to present credible expert testimony comporting with Rule 702(c), in that the experts failed to rely upon any generally accepted scientific methodology to arrive at their opinions and failed to consider all relevant facts to support a causal link between Mr. Garced's initial exposure and subsequent development of RADS, his claimed permanent injury.

It cannot be disputed that in a case where it is claimed that an initial injury related to a chemical exposure of undefined specificity is connected with future disease, competent expert testimony is required on the question of

_____

[9] We do take an exception with the trial court's rationale in concluding that Appellants failed to establish causation between the exposure and his development of RADS. We do not agree with the court's assertion that Halomist and Halospray have different concentrations of hydrogen peroxide. The record reflects that Halomist and Halospray have the same ingredients and concentrations. TC-1 at 435, 450 (listing ingredients of both Halomist and Halospray). They are chemically the same but their use and use protocols, including labelling and packaging, are different. N.T. 9/28/21 at 22, 44-45, 57-58. Notwithstanding this error, we agree with the trial court's conclusion that Appellants' expert testimony was deficient because the testimony did not rest upon generally accepted scientific methodology and was simply an expression of the experts' personal beliefs.

causation. *See Hamil v. Bashline,* 392 A.2d 1280, 1285 (Pa. 1978) ("[I]t is generally acknowledged that the complexities of the human body place questions as to the cause of pain or injury beyond the knowledge of the average layperson[;] therefore, the law requires that expert medical testimony be employed"). For expert testimony to be admitted at trial, the testimony must comport with the requirements of Pa.R.E. 702 that provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> **(a)** the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> **(b)** the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> **(c)** the expert's methodology is generally accepted in the relevant field.

It must be emphasized that the proponent of expert scientific evidence bears the burden of establishing all the elements for its admission under Rule 702, which includes (when applicable) a showing that the **Frye** test is satisfied. **Grady v. Frito-Lay, Inc.,** 839 A. 2d 1038, 1045 (Pa. 2003).

The **Frye** test was adopted in Pennsylvania in **Commonwealth v. Topa,** 369 A.2d 1277 (Pa. 1977), and "is part of Rule 702." **Grady,** 839 A.2d at 1042. The **Frye** test provides that *novel* scientific evidence is admissible "if the methodology that underlies the evidence has general acceptance in the relevant scientific community." **Id.** Our Supreme Court has made it clear

however, that *Frye* is not implicated every time science comes into the courtroom; rather, it applies only to proffered expert testimony involving novel science. *Commonwealth of Pennsylvania v. Dengler*, 890 A. 2d 372, 382 (Pa. 2005).[10] Therefore, while the methodology underlying expert testimony must generally be accepted in the relevant field, it is only when testimony is based upon novel science that the *Frye* test also must be met. Moreover, the *Frye* test applies to an expert's methods, not to conclusions. *Grady*, 839 A.2d at 1047. Presently, we find that there is no need to determine whether any methodologies utilized by Appellants' experts passed the *Frye* test to admit novel science, since no methodologies **at all** were identified to support causation in their testimonies. To the extent either of Appellants' experts attempted to establish causation based upon a differential diagnosis[11] as a methodology, they failed, as they did not account for

---

[10] "What constitutes novel scientific evidence has historically been decided on a case-by-case basis, and there is some fluidity in the analysis; indeed, science deemed novel at the outset may lose its novelty and become generally accepted in the scientific community at a later date, or the strength of the proponent's proffer may affect the *Frye* determination." *Dengler,* 890 A.2d at 382.

[11] A differential diagnosis is a generally accepted methodology. *Pledger by Pledger v. Janssen Pharmaceuticals*, 198 A.3d 1126, 1141 (Pa. Super. 2018); *Stange v. Janssen Pharmaceuticals, Inc*., 179 A.3d 45, 55 (Pa. Super. 2018). In performing a differential diagnosis,

> a physician begins by 'ruling in' all scientifically plausible causes of the plaintiff's injury. The physician then 'rules out' the least plausible causes of injury until the most likely cause remains. The

*(Footnote Continued Next Page)*

preexisting conditions and/or other possible causes of Mr. Garced's current problems. An expert's personal belief, standing alone, is not sufficient proof that his methodology is generally accepted. As we stated in *Snizavich*:

> The exercise of scientific expertise requires inclusion of scientific authority and application of the authority to the specific facts at hand. Thus, the minimal threshold that expert testimony must meet to qualify as an expert opinion rather than merely an opinion expressed by an expert, is this: **the proffered expert testimony must point to, rely on or cite some scientific authority**— whether facts, empirical studies, or the expert's own research— that the expert has applied to the facts at hand and which supports the expert's ultimate conclusion. **When an expert opinion fails to include such authority, the trial court has no choice but to conclude that the expert opinion reflects nothing more than mere personal belief**[.]

*Id.* at 197 (citation omitted) (emphasis added).

Appellants relate in their appellate brief that prior to the presentation of other expert testimony, Mr. Garced testified that while working as a cleaning contractor at UCP on May 26, 2016, he was exposed to a chemical fog emanating from an adjacent room in which HaloSpray was being used due to a failure to seal the adjacent room from the one in which he was cleaning. While mopping the floor he noticed his face burning, looked up and saw a fog, and ran out of the room. He estimated his time in the room was approximately

---

final result of a differential diagnosis is the expert's conclusion that a defendant's product caused (or did not cause) the plaintiff's injury.

*Glastetter v. Novartis Pharmaceuticals Corp.*, 252 F.3d 986, 989 (8th Cir. 2001).

twenty minutes. He went to a hospital emergency room where he was given oxygen. He had coughing, burning, chest tightness, and pain in his chest that he rated five out of ten. He testified that he never had any respiratory problems before. Following the incident, he stated that he had shortness of breath, coughing, pain in his chest, left sided sinus pain and swelling. He saw several pulmonologists as well as his family doctor who all diagnosed irritant induced asthma or RADS, together with chronic left sided sinusitis. He had sinus surgery. Despite multiple medications and injections, he testified that he still has difficulty breathing, coughing, and shortness of breath and that his pulmonary function tests have declined over time. In 2019 he stopped working.

Appellees point out that uncontradicted facts of record also established that while at the emergency room, Mr. Garced's vital signs were normal, including his oxygenation, and he had a normal chest x-ray. Mr. Garced did not suffer from any ongoing injury for several months after this exposure, and his lung function showed no continuing injury. Two weeks after the incident, Mr. Garced saw a physician at Penn Medicine, who concluded he had no continuing symptoms, that is, no current signs or symptoms of respiratory disease. In August 2016, Mr. Garced's pulmonary function tests were normal. He also had a CAT Scan at that time that showed no lung abnormalities. Nonetheless, Mr. Garced complained of shortness of breath, coughing, and sinus and chest pain several months later and saw a physician. The physician

ordered additional tests, one of which suggested that—several months after May 26th—Mr. Garced had developed signs of lung injury. Ultimately, Mr. Garced was diagnosed with RADS.

Against this competing evidence, Appellants attempted to establish a causal link between Mr. Garced's May 26, 2016 exposure to HaloSpray and his claimed permanent injury through the expert testimony of two physicians: Drs. Lazaar and Savul.

Dr. Aili Linay Lazaar, Garced's treating physician, board certified in internal medicine, pulmonary medicine, and critical care, N.T., 9/29/21, at 27, testified as a treating physician and expert on Mr. Garced's behalf. She first became involved in his care in June 2017, *id.* at 33, more than a year after Mr. Garced's exposure to HaloSpray in May 2016. She testified that when Mr. Garced was seen after the exposure in the Einstein emergency room, the only abnormality observed was some redness in his mouth, *id.* at 36, and his pulmonary function test or spirometry was normal. *Id.* at 37. A chest x-ray done at the hospital and a later CAT scan likewise showed no abnormality. *Id.* at 38. A *working diagnosis* at that time (in June 2017), based upon Garced's report of persistent symptoms, was RADS, which constricts the bronchial tubes like asthma. *Id.* at 39. A methacholine challenge test[12]

---

[12] A methacholine challenge test is a breathing test to see how lungs are working. It checks for asthma in patients who have a cough, trouble breathing, or other breathing problems. Methacholine is a medication that

*(Footnote Continued Next Page)*

performed by another physician was positive, leading Dr. Lazaar to agree with a diagnosis of RADS. *Id.* at 43. At the time of trial, Mr. Garced was a patient of Dr. Lazaar for four years and saw her three to four times a year. *Id.* at 45. Because Mr. Garced had no previous history of respiratory disorder, Dr. Lazaar opined that Mr. Garced developed his problems from his exposure at the workplace, and that the exposure to the mist and fog in the room was the cause of the irritants to his airway and his subsequent problems. *Id.* at 46. Based upon (1) statements in the material sheets for the mist or cleaning solution that the product contained hydrogen peroxide (its main component), as well as silver nitride with phosphoric acid, and (2) Mr. Garced's reporting that he was exposed to a high concentration of the mist in the room, it was her opinion that Garced's exposure was consistent with RADS. *Id.* at 46-50. Dr. Lazaar also opined that the persistence of Mr. Garced's symptoms after a number of years since his initial exposure and his worsening pulmonary function tests showed that he developed more persistent symptoms of asthma. *Id.* at 65-66. She testified that beginning in February 2018, Mr.

---

makes airways narrow if the patient has asthma. Asthma is a lung condition that can make it hard to breathe. During the test, the patient breathes in small amounts of methacholine, and a pulmonary technologist measures lung function. Normal lung function will be measured first (also known as baseline breathing). Then the patient starts the test, and the methacholine is added. If lung function drops by 20% or more from the patient's baseline, he may have asthma. *See* *https://www.mskcc.org/cancer-care/patient-education/methacholine-challenge-test.*

Garced underwent additional tests to see if other therapies might help him. *Id.* at 67. Two of the values looked at for persistent asthma are the levels of eosinophils and another blood protein called IgE. *Id.* at 67. While eosinophil levels were normal, IgE levels were elevated. *Id.* at 68. Xolair, an injection therapy, was prescribed and given to Mr. Garced every two weeks. *Id.* Despite an elevated IgE level, Dr. Lazaar testified that her opinion that Mr. Garced suffers from RADS as a result of exposure to toxic fog remained unchanged. *Id.* at 69. She did admit, however, that Mr. Garced had a history of chronic hives and elevated eosinophils prior to his exposure, but that did not necessarily mean he also had asthma. *Id.* at 69-70.

On cross-examination, Dr. Lazaar acknowledged that she issued three reports: one in August 2019, another in August 2020, and the third in October 2020. *Id.* at 85. The first, based upon the report of another physician, Dr. Swartz, indicated that Mr. Garced fit the definition of RADS. In the second, Dr. Lazaar reported a diagnosis of asthma, and in the third, a diagnosis of allergic inflammation and asthma. *Id.* at 86-87. She then offered her opinion that Mr. Garced has a combination of an allergic tendency as well as pulmonary symptoms instigated by the exposure. *Id.* at 88. Allergic asthma can be progressive over time, *id.* at 91, and can present as new symptoms in middle age. *Id.* at 92. Mr. Garced's history over a year before the incident also indicated allergies to fish and iodine, causing anaphylaxis. *Id.* at 98. Dr. Lazaar admitted that as of June 2015, Mr. Garced had a history of hives and

dry tongue and throat. *Id.* at 100. She also related that Mr. Garced's airway showed some "remodeling" and that it had undergone some chronic changes. *Id.* at 103. She admitted that he had a diagnosis of Barrett's esophagus, which she qualified may in severe cases cause inflammation of the airway, *id.* at 104, and that many airway disorders can cause inflammation of the airway. *Id.* at 105-106. She admitted that although Mr. Garced's lung function declined as a result of airway remodeling due to ongoing inflammation, she had not done any studies to determine the type of inflammation that he exhibited. *Id.* at 106. While admitting that the literature indicates that most people with RADS due to an acute exposure resolve quickly, and that Mr. Garced had normal findings at the emergency room after the incident, her opinion remained unchanged because sometimes it takes times for a response to develop. *Id.* at 107-108. She had no personal knowledge of the quantity of dose of the exposure claimed by Mr. Garced. N.T., 9/29/21, V.II, at 11. Dr. Lazaar simply noted that some of the ingredients of HaloSpray, in an unspecified quantity, were "known to be a respiratory irritant." N.T., 9/29/21, at 49. Dr. Lazaar further claimed that the "fog or mist" that Mr. Garced saw "suggest[ed] a high concentration or high amount of that mist in the room." *Id.* Hydrogen peroxide is a component of Halomist and is known to be a respiratory irritant. *Id.* She noted Mr. Garced's symptoms have become more persistent over the years since the incident and that he had no report of respiratory symptoms prior to the RADS diagnosis. *Id.* at 33, 65-66. Her

opinion was that Garced's exposure to the mist triggered an ongoing response and chronic respiratory illness, and the fact that he was normal after the emergency room visit did not affect her diagnosis because it takes time for the ongoing response to develop. *Id.* at 106-07.

Dr. Savul, a board-certified occupational medicine expert, testified as Appellants' second and final expert witness respecting Mr. Garced's injury. He was familiar with RADS having seen it while practicing family medicine and from observing chemical exposures. N.T., 9/29/21, V. II, at 45. While stating that he was prepared to discuss Mr. Garced's injuries, problems and disabilities, and long-term effects due Mr. Garced's exposure on May 26, 2016, he never tested HaloSpray and its effects. *Id.* at 47-49. Dr. Savul reviewed Mr. Garced's records from 2016 through 2019, as well as deposition transcripts and material data sheets for HaloSpray. *Id.* at 55-56. He first saw Mr. Garced in September 2019 as part of an independent medical evaluation, at which time he was having episodes of asthma attacks. *Id.* at 58. Because he believed Mr. Garced never had any issues or history of asthma prior to May 2016, he diagnosed him as having RADS. *Id.* at 88. His examination of Mr. Garced revealed tenderness when he pressed on his sinuses, and Mr. Garced complained of coughing, wheezing, shortness of breath, and chest tightness. *Id.* at 90-91. Mr. Garced also had an anostomy performed on his sinuses to clear blockages and to help with thickening of the wall. *Id.* at 86-93. Dr. Savul offered his opinion that his "number one relevant

diagnosis" was that Mr. Garced suffered from RADS, or an irritant induced occupational asthma as a result of the May 26, 2016 exposure, since Mr. Garced never had asthma prior to that time. *Id.* at 93-94. His opinion remained unchanged regardless of whether Mr. Garced was exposed for 3 or 4 minutes or 10 to 20 minutes because he had symptoms during that time. *Id.* at 101. He considered Mr. Garced to have had a significant exposure. *Id.* at 112. He admitted, however, that there is a permissible dose of HaloSpray, measured in parts per million, that is considered safe, but he never assessed the actual concentration of HaloSpray in the air on the date of the incident. *Id.* at 48-49, 115.

On cross-examination, Dr. Savul admitted that as of the time he produced his expert report, he did not have any records regarding Mr. Garced prior to May 26, 2016, N.T., 9/30/21, at 62, but subsequently did review records from 2011 and a 2015 visit. *Id.* at 62-63. He then recalled that the 2015 record did indicate some left sided face and nasal burning. *Id.* He saw Mr. Garced three years after the incident for an independent medical exam and not as a treating physician. *Id.* at 68. He reviewed Dr. Lazaar's report and agreed with his [sic] diagnosis of irritant-induced occupational asthma, or RADS. *Id.* at 69. He was unaware that in October 2020, that Dr. Lazaar changed her diagnosis to allergic inflammation and allergic asthma, *id.* at 71, but indicated that would not necessarily change his diagnosis; he would have to reassess the records. *Id.* at 71. He admitted reviewing pulmonary function

tests from 2016 through 2019 that showed a decline in function, but also admitted that in August 2016, Mr. Garced's function was normal and his decline in function did not begin until August 2017. *Id.* at 73-76. Deterioration of lung function over time, Dr. Savul said, is typical for "any asthma", including allergic asthma. *Id.* at 81. He admitted that records from 2014 indicated that Mr. Garced had a sinus infection, *id.* at 84-85, which he later admitted was diagnosed as chronic sinusitis. *Id.* at 87. He did not know if any treatment was effective. *Id.* at 88. As well, he admitted not seeing records from 2014 that indicated that Mr. Garced (age 56 at the time) was complaining of pain, swelling, and burning in his throat, bumps on his tongue and itching on lips, and that his nose felt like it was on fire. *Id.* at 86. He also acknowledged that records from Penn Medicine Allergy from 2015 indicated oral and nose burning, a rash, and chronic rhinitis. *Id.* at 89-90. Other records also revealed he had sinus surgery in the 1980's. *Id.* at 93. Still other records revealed extensive use of nasal cocaine that Dr. Savul admitted could affect sinuses and that he did not have these records when completing his evaluation. *Id.* at 100-104. Regardless, he stated those records would not affect his opinions. *Id.* at 112-113.

Our review of the record in this case establishes that Appellants' experts presented *no methodology*—or in the words of *Sniavich*, no "facts," no "empirical studies," and none of their "own research," 83 A.3d at 197—in support of their ultimate conclusions that HaloSpray caused Mr. Garced's long-

term injuries, i.e., RADS. Dr. Lazaar testified that hydrogen peroxide "is known to be a respiratory irritant" and that the "fog or mist" that Mr. Garced saw "suggest[ed] a high concentration or high amount of that mist in the room." N.T., 9/29/21, at 49. Similarly, Dr. Savul testified that Mr. Garced's chronic condition was caused by "significant exposure" to the mist or fog in the room at UCP. N.T., 9/30/21, at 112. Conspicuously absent from any of their expert testimony, however, is any attempt to cite any credible or accepted scientific studies that link a single exposure of unknown quantity or intensity of the irritant identified in HaloSpray that caused an immediate injury that subsequently resolved, to the delayed response they opined as RADS due to the initial exposure. Neither expert presented any facts, studies or research that established (or even estimated) the concentration of any respiratory irritant to which Mr. Garced was exposed, or to establish a nexus between any irritant and Mr. Garced's long-term conditions. To the extent any literature was referenced, that literature indicated that most people with RADS due to an acute exposure resolve quickly. Consistent with this was testimony and other evidence that Mr. Garced had normal findings at the emergency room after the incident and thereafter. The fact that Mr. Garced's methacholine challenge tests produced results consistent with asthma did nothing more than establish that fact but do nothing in and of themselves to establish a causal link between the HaloSpray exposure and delayed onset of RADS. It appears

both experts' opinions reflect nothing more than their own personal beliefs, or at best, a working diagnosis.

Nor did any of Appellants' experts attempt to conduct a credible differential diagnosis to eliminate other possible causes of Mr. Garced's delayed onset of RADS. A differential diagnosis would have been essential in light of Mr. Garced's medical history, the normal exams conducted contemporaneously with his exposure and thereafter, and the fact that his lung function did not start to decline until more than a year after the incident. Neither expert considered nor attempted to eliminate as possible causes of RADS any of Mr. Garced's medical history prior to May 26, 2016. That history included a) pain, swelling, and burning in his throat, bumps on his tongue, itching on lips, a nose that felt like it was on fire, b) records from Penn Medicine Allergy from 2015 that indicated oral and nose burning, a rash, and chronic rhinitis, c) records that revealed Garced had sinus surgery in the 1980's, d) prior to his exposure in 2016, he had elevated eosinophils indicative of asthma, e) for over a year before the incident, he had allergies to fish and iodine, causing anaphylaxis, f) he had a history of hives and dry tongue and throat, and g) a diagnosis of Barett's esophagus. Dr. Lazaar's testimony that she had not done any studies to determine the type of inflammation exhibited by Garced, that many airway disorders can cause inflammation of the airway, and that allergic asthma can be progressive over time and can present as new symptoms in middle age, made imperative a credible differential diagnosis to

establish the casual link between the HaloSpray exposure and a subsequent diagnosis of RADS. What is apparent is that neither of Appellants' experts were able to provide a differential diagnosis that Mr. Garced developed RADS as a result of the singular exposure to HaloSpray in an unspecified quantity and intensity on May 26, 2016. **Cf. Anderson v. Hess Corp.,** 592 F. Supp. 2d 1174 (D.N.D. 2009) (expert Neumann properly conducted differential diagnosis to establish the causal connection between plaintiff's exposure to hydrogen sulfide and sulfur dioxide, and RADS where expert ruled out other possible causes of plaintiff's symptoms).

Appellants clearly failed to satisfy Rule 702(c)'s standard of employing generally accepted methodology in coming to their opinions to establish a causal connection between the May 2016 exposure and Garced's claimed permanent lung injury. Accordingly, we hold that the trial court properly entered JNOV against Appellants on their claims of future medical expenses and future noneconomic loss.

### III. PAST ECONOMIC LOSSES

Appellants assert that the trial court erred by awarding a new trial limited to Mr. Garced's past noneconomic loss. We agree with the trial court's decision. The jury awarded $500,000.00 for "past, present, and future pain and suffering, embarrassment and humiliation and loss of enjoyment of life" without distinguishing between the amounts awarded for past, present, and future damages. As discussed above, the trial court properly entered JNOV

as to future medical expenses and future noneconomic loss, leaving past noneconomic loss as the only recoverable item of damages. Since the verdict sheet failed to specify this amount, a new trial is necessary to determine what, if any, damages are recoverable for past noneconomic loss.

## IV.   GRANT OF A NEW TRIAL – THE INTERPRETER PROBLEM

Appellants argue the trial court abused its discretion in granting a new trial based upon their conduct with respect to the interpreter. The trial court ordered that a new trial was necessary due to Appellants' misconduct vis-à-vis Mr. Garced's interpreter.  We find no abuse of discretion.

Our Supreme Court has held:

A new trial should be granted if the judge finds that an injustice has been done. Among the recognized reasons for granting a new trial is misconduct by counsel.  The power to grant a new trial is inherent in the court, and the decision to grant or deny a motion for new trial rests within its sound discretion.  The court's decision will not be disturbed on appellate review absent an abuse of that discretion.

*Colosimo v. Philadelphia Elec. Co.*, 518 A.2d 1206, 1210 (Pa. 1986) (citations omitted).

During trial, Mr. Garced, whose primary language is Spanish, required an interpreter to relate his testimony.  At the end of the first day of trial, Mr. Garced was in the middle of his testimony and still under oath.  Nonetheless, he, his wife, the interpreter, and Plaintiff's counsel's paralegal met and discussed his testimony from earlier that day.  N.T., 10/1/21, at 12-13 (Mrs. Garced), N.T., 10/5/21, at 56-57 (interpreter).  Mrs. Garced complained that

- 30 -

the interpreter did not include all businesses that Mr. Garced stated he was working with when the incident at UCP happened. N.T., 10/1/21, at 13 (Mrs. Garced), N.T., 10/5/21, at 56-57 (interpreter). She also told Mr. Garced that he "didn't say the right things." N.T., 10/5/21, at 58 (interpreter). Halosil's counsel observed this conversation and reported what she observed to the court on the morning of the next day of trial. Appellants' counsel agreed that the conversation was not appropriate and advised the court that he dismissed the interpreter. The trial court ordered the parties to depose the interpreter.

During the interpreter's deposition, Appellees learned for the first time that this same interpreter had met with Appellants and their counsel at counsel's office for several hours about one week before trial. This fact was not disclosed to the court or to opposing counsel prior to the deposition. The interpreter testified that he was concerned that serving as the court interpreter for Mr. Garced's trial might be a conflict of interest. N.T., 10/5/21, at 69, 71. When the interpreter's boss requested that the interpreter serve as the court interpreter during trial, the interpreter told his boss of his concerns regarding a conflict of interest. *Id.* at 71. The interpreter's boss told the interpreter that "it had been okayed by a judge." *Id.* at 72. However, the court did not approve of the conflict and was never apprised of it. The trial court observed that these issues would have remained concealed from the court if Appellees' defense counsel not observed Appellants talking with the interpreter. Trial Court Memorandum, 10/5/21, at 5.

Following the interpreter's deposition, the court reviewed the transcript and held a hearing to further investigate this matter. The court later noted that "[a]t no time did [Appellants'] counsel provide any credible explanation for his nondisclosure or lack of candor." *Id.* at 6.

Moreover, Appellants' counsel unilaterally discharged the interpreter, N.T., 10/2/21, at 6 (Appellants' counsel's representation that he had "procured a different interpreter"), which made it difficult for the court to examine the interpreter's conduct further.

Mrs. Garced was questioned about her communications with the interpreter. She testified that the pretrial meeting took place at her request because she wanted to meet the interpreter before trial to make sure "the testimony here in court would go smoothly." N.T., 9/30/21, at 106. In particular, she wanted to see whether the interpreter could understand Mr. Garced's dialect. *Id.* She insisted she could not remember anything else she had told the interpreter. N.T., 10/1/21, at 12. She also said she could not remember whether she told her husband he had missed parts of his testimony. *Id.* at 13. Nonetheless, she admitted she might have told Mr. Garced his testimony was not correct. *Id.* at 14. She also made repeated outbursts to the jury during the trial, accusing Appellees of lying, among other things. N.T., 9/30/21, at 73.

Appellees moved for a mistrial and directed verdict based on Appellants' attempts to influence the interpreter. The trial judge issued a lengthy

memorandum denying a mistrial but granting a curative instruction to apprise the jury of Appellants' misconduct. The court determined that Appellants and their counsel participated in an "*ex parte* effort to hector, intimidate and interfere with [the] Interpreter and translator witness and Officer of the Court and further demonstrated an intentional effort to coach, influence and recast direct present testimony of Mr. Garced and his anticipated cross examination while he was still testifying on direct." Trial Court Memorandum, 10/5/21, at 8. At the post-trial motion stage, however, the court, upon reflection, determined that the curative instruction did not adequately cure the taint of Appellants' misbehavior. The court listed multiple instances of misconduct by Appellants and their counsel and determined that the proper remedy was to grant a new trial and to impose monetary sanctions of $5,000.00 against Appellants' counsel, and for the Garceds to pay counsel fees incurred by the Appellees to address the interpreter issue.

We find no abuse of discretion by the trial court ordering a new trial based upon Appellants' use of an ethically compromised interpreter. The Pennsylvania Rules of Professional Conduct for Judiciary Interpreters prescribe that interpreters "shall be impartial and unbiased and shall refrain from conduct that may give an appearance of bias or favoritism." Rule 3, Pennsylvania Rule of Professional Conduct for Judicial Interpreters, 204 Pa. Code, Schedule F. The Comment to Rule 3 further explains that "[d]uring the course of the proceedings, interpreters should not converse with parties,

witnesses, jurors, attorneys, or friends or relatives of any party, except in the discharge of their official functions." *Id.* Interpreters must also disclose, before they testify, "any prior involvement, whether personal or professional, that could reasonably be construed as a conflict of interest," and whether "they have been previously retained for private employment by one of the parties in the case." *Id.* The interpreter herein failed these requirements. His pretrial meeting with Appellants to help them prepare for trial ended his impartiality and, along with his conversation with them during the trial, created an appearance of bias and favoritism. The interpreter's violation of the rules, albeit at the behest of Appellants and counsel, requires a new trial, as the trial court held.

In addition, Appellants' and their counsel's misconduct relating to the interpreter made a new trial an absolute necessity. As the trial court pointed out, (1) Appellants' counsel made no credible effort to retain a qualified interpreter from the court's pool and failed to retain one who could attend the entire trial, (2) before defense counsel saw Appellants and their counsel conversing with the interpreter, Appellants' counsel failed to disclose to defense counsel or the court that he employed the interpreter to assist Appellants in trial preparation, (3) Appellants' counsel then discharged the interpreter preemptively to prevent the court from examining him, resulting in additional trial delays, and (4) the interpreter's employer was advised— likely by Appellants' counsel—that his pretrial meeting with Appellants did not

create a conflict. While Appellants' counsel suggested it was mere coincidence that that he employed the same interpreter for trial that he and Appellants met with one week before, it does not appear that this was any accident. The clear purpose of the pretrial meeting was to coach the interpreter as to Mr. Garced's accident to prepare the interpreter for trial. Based on these observations, we agree with the trial court that Appellants' and their counsel's actions "were purposely, calculating and premeditated, part of an intentional plan to disrupt control, limit, and engineer [Mr. Garced's] testimony." *Id.*

In addition, we find no abuse of discretion by the trial court in concluding that its curative instruction did not obviate the need for a new trial. The instruction stated that the meetings between Appellants, their counsel, and the interpreter before and during trial were wrong. N.T., 10/4/21, at 10-14. It also advised that the jury could disregard some or all of Appellants' testimony based on their conduct. *Id*. at 15. The instruction also stated that the jury could disregard Appellants' expert testimony to the extent the experts relied on Appellants' testimony. *Id*. While this instruction addressed some of the misconduct, it could not adequately remedy the damage done. The instruction did not advise the jury about numerous aspects of Appellants' and their counsel's misconduct. As the trial court noted, their conduct was an intentional effort to manipulate and control the evidence at trial. Memorandum Opinion, 12/7/21, at 16, 22. Appellants interfered with the interpreter's impartial translation of testimony. As the trial court stated, "the

misconduct before the court takes the analysis beyond whether the instruction sufficiently informed the jury of the reasons for the discharge of the interpreter, to the question of whether a mere instruction could remedy a pattern of deceit and misconduct revealed during the trial." *Id.* at 17. No relief is due Appellants on this issue.

## V.  COUNSEL FEES UNDER §2503(7)

Relatedly, we also conclude that the court acted well within its discretion under 42 Pa.C.S.A. § 2503(7),[13] by imposing sanctions upon Appellants' counsel of $5,000.00 and directing Mr. and Mrs. Garced to pay counsel fees to Appellees relating to litigation concerning the interpreter issue.[14] Appellate

_____

[13] Section 2503(7) provides:

> The following participants shall be entitled to a reasonable counsel fee as part of the taxable costs of the matter:
> ***
> (7) Any participant who is awarded counsel fees as a sanction against another participant for dilatory, obdurate or vexatious conduct during the pendency of a matter.

"Participants" are defined to include litigants, witnesses, and their counsel. 42 Pa.C.S.A. § 102.

[14] We recite in full the many bases upon which the trial court imposed sanctions to inform the reader of the egregious conduct warranting the imposition of sanctions. To wit, the trial court found:

> 1) [Appellants] played fast and loose with this Court's discovery Orders (see Order of Judge Robins-New of September 10, 2019) as to the Garceds' income and failed to provide to provide [sic] complete tax records;[1]

*(Footnote Continued Next Page)*

1 [Appellants] might argue that this misconduct had no bearing on the outcome of the trial since the jury did not award damages for lost income. The court disagrees. It was clear from the testimony at trial, based upon [Mr.] and Mrs. Garced's withholding of their complete tax history and providing of only a partial Schedule C as to the cleaning business, that [Mr.] and Mrs. Garced, at a minimum, defrauded Federal, State and local taxing authorities and their employees by paying their employees undisclosed sums "under the table" and purported to excuse such behavior by asserting that Mr. Garced claimed " all of the income as his own" and that he, himself, had (allegedly) paid the taxes on his employees' compensation (by calling it his "income")(N.T. 10/4/21 a.m., p. 49, lines 11-18; p. 50, lines 12-24), an assertion that could not be verified due to the failure to produce complete records and, more troublingly, represented an effort by [Mr. Garced] to offer the very limited evidence in his Schedule C Federal tax returns to support his damages claims, evidence he knew to be false based upon the "under the table" admission during his testimony. In doing so, Mr. Garced clearly knowingly proffered fraudulent evidence to the Court and defrauded both his employees and taxing authorities since he did not pay withholding, federal, state or local income taxes (such as FWT, FICA, FICA Med, Pennsylvania State Tax, Philadelphia Wage Tax and Affordable Care Act Compliance and 1099 disclosure) attributed to their earnings, or address his obligations as employer to protect them by paying for workers' compensation or medical insurance (or the penalty for not providing medical insurance). Regardless of the specious claim that [Mr.] Garced "paid the taxes" as his own, [his] failure to provide complete records prevented [Appellees] from challenging him on cross-examination or using the records to show that Mr. Garced was a fraud and liar, factors that would have undermined his credibility entirely to the Jury.

2) [Appellants] failed to comply with the Court's Pre-trial Order (under risk of Sanction) requiring [them] to retain a qualified interpreter who would be available for the entirety of the trial (necessitating repeated delays in the trial and requiring the use of three different interpreters);

3) [Appellants'] counsel never made any credible efforts to timely secure an interpreter with the First District Court Reporter Digital and Interpreter Administration (as required for the entirety of the trial);

4) Thereafter [Appellants'] counsel misled defense counsel (as to an agreed upon joint engagement of the Court Interpreter) as to

*(Footnote Continued Next Page)*

the only available option being a private interpreter in order to secure defense counsel's acquiescence in [Appellants'] privately screened and selected interpreter;

5) When Mr. Guerra appeared at the trial to serve as the Court Interpreter, neither he nor [Appellants'] counsel disclosed to defense counsel that he had previously been employed by [Appellants'] counsel to assist in the pretrial preparation of [Appellants'] testimony for trial in order to determine whether [Appellees] still consented to the use of this private interpreter;

6) When [Appellants'] counsel became aware that defense counsel had overheard the improper *ex parte* conversation between [Appellants], the interpreter and counsel's paralegal, he unilaterally discharged the interpreter on the day of trial in order to shield him from the court's examination and to cover up the questionable circumstances of his hiring, further interrupting and delaying the progress of trial;

7) Counsel's unilateral discharge of the Court Interpreter without securing a replacement ensured that the trial would suffer some sort of significant interruption;

8) [Appellants'] counsel  unilaterally dismissing his client from Court while still under cross-examination presented the court with the dilemma of adjourning the trial or disrupting the ongoing testimony of Mr. Garced (an option that allowed him the benefit of previewing and preparing to gain an unfair advantage in the continuation of his cross examination and by watching the entirety of [Appellants'] case before having to resume his testimony and further prepare him for anticipated cross examination);

9) When asked to address the circumstances of the hiring of the interpreter after defense counsel raised concerns over the improper conversation of the Court Interpreter with counsel's paralegal, Mrs. Garced and [Mr. Garced], [Appellants'] counsel asserted incredibly to the court that he had been unable to secure a court interpreter (the later-revealed facts surrounding the hiring

*(Footnote Continued Next Page)*

of Mr. Guerra confirm that [Appellants] never intended to hire a Court Interpreter but only wanted someone who had been screened and approved by [counsel], Mr, Garced and Mrs. Garced, a fact that would have remained unknown to the court and defense counsel but for the fortuity of defense counsel discovering the *ex parte* conversation);

10) [Appellants'] counsel never disclosed to the court prior to calling Mr. Garced to the stand that the Court Interpreter had been secretly employed by him in connection with preparing Mr. Garced to testify at the trial, and thus had been a part of counsel's "trial team;"

11) Someone, likely associated with [Appellants'] trial team, falsely misrepresented to the Interpreter or his employer that any conflict arising out of Mr. Guerra's previous employment for the trial prep had been brought to the court's attention and this court had waived the interpreter's conflict of interest, a representation that discouraged the Interpreter from making a disclosure of his own;

12) When questioned by the court regarding the circumstances of hiring the interpreter, [Appellants'] counsel insincerely deflected any potential for an ethical lapse or conflict of interest, proclaiming that the interpreter had accurately translated the testimony, calling a conflict merely "arguable";

13) [Appellants'] counsel attempted to suggest that it was merely fortuitous that the same individual hired to assist in the trial prep was sent by his agency to handle the trial, a suggestion wholly undermined when Mrs. Garced testified that she had specifically requested the opportunity to screen the interpreter in advance of the trial to see if the Court Interpreter "was on the same page" as [Appellants];

14) [Appellants'] counsel declined to address why he failed to disclose the prior employment of Mr. Guerra before commencing Mr. Garced's testimony, a failure which, at this stage, can only be

*(Footnote Continued Next Page)*

- 39 -

attributed to a purposeful and conspiratorial plan between counsel and client to intimidate and influence the efforts of the interpreter at the time of trial;

15) This intention to intimidate and influence is confirmed in the testimony of Mr. Guerra regarding the hallway conversation in which Mrs. Garced was hectoring him regarding the quality of his translation and he admittedly engaged with Mr. Garced in discussing the substance of his testimony (and but for defense counsel overhearing these parties, the fraud on the court and defendants would have continued);

16) When questioned regarding the contents of the hallway conversation both Mr. and Mrs. Garced suffered mendacious memory lapses (N.T. 10/1/21 a.m., pp. 13-15; 10/4/21 p.m., pp. 25-26);

17) Mrs. Garced's admissions regarding her intentions for an advance preview with Mr. Guerra conflicted with counsel's evasive responses to the court's direct questions about Mr. Guerra's appearance in court and implicate counsel in an apparent intentional effort to mislead the court; and

18) Mrs. Garced refused to follow the court's rulings or counsel's instructions and engaged in frequent outbursts in front of the jury and argued directly with the court; and

19) Counsel improperly questioned his client in an effort to undermine and contradict the Ruling and Order of the Court to argue or by his questions suggest in front of the jury that the hallway conversation (contrary to the Courts findings and Order) and other improper contacts had not affected the truthfulness of his testimony and had not caused him to change his testimony. (N.T. 10/5/21 a.m., p. 31, lines 11-17).

Memorandum Opinion, 12/7/21, at 18-22.

review of a trial court's order awarding attorney's fees to a litigant is limited solely to determining whether the trial court palpably abused its discretion in making a fee award. **Thunberg v. Strause,** 682 A.2d 295, 299 (Pa. 1996). We agree with the trial court's rationale and find no abuse of discretion in imposing sanctions as articulated in its opinion which we reproduce, in part, as follows:

> The consideration of these matters in post-trial proceedings allows the court to address a matter the court reserved for further action in the earlier ruling addressing the conduct of [Mr. Garced], Mrs. Garced and [their] counsel….[When addressing [Appellees'] Motions for Directed Verdict, Motion to Strike or in the Alternative for Mistrial] … in the heat of the trial and faced with the continuing and increasingly intentional obstruction, dilatory and prejudicial conduct by counsel, [Mr.] and Mrs. Garced, a ruthless ongoing waste of the valuable time of the jury, the Court and Defense, and without time for significant reflection or the benefit of determining the full impact of [their] misconduct on the jury, the court elected to continue with the trial in the hopes that a curative instruction that informed the jury of the out-of-court misconduct and the (as then charged, hypothetical) impact on the witnesses' credibility would fully address the concerns raised in the motions. However, the court also anticipated that a mere instruction might not be sufficient to resolve the affront to the court, the jury and the system of justice, prevent additional contumacious conduct by [Appellants] and counsel, or mitigate the prejudice to [Appellees].

Memorandum Opinion, 12/7/21, at 16.

\*\*\*

> The court now, upon reflection, in recognition of the gravity of the subsequent misconduct during the remainder of the Trial, and in consideration of whether the conduct warrants further sanctions, examines the entire record of the trial, to evaluate the evidence and counsel['s] and [Appellants'] misconduct before the court, and to determine whether the curative instruction adequately cleansed the record of the misconduct or successfully prohibited the admonished counsel as to future misconduct.

*Id.* at 17.

\*\*\*

The court has had the advantage of observing the demeanor and tone of the participants in addressing the concerns surrounding the Interpreter (and throughout the proceedings) and finds based upon these observations that the actions of [Appellants'] and counsel were purposeful, calculating and premeditated, part of an intentional plan to disrupt control, limit, and engineer [Mr. Garced's] testimony. The hiring of Court Interpreters with significant known ongoing unavailability and scheduling conflicts ensured that Mr. Garced's testimony would suffer frequent and significant interruptions, preventing [Appellees] from making substantial inroads on cross examination and allowing for breaks in the testimony for coaching the witness. Further this misconduct of [Appellants] was, in the totality of the conduct before the court, a transparent plan to waste the allotted trial time, to allow [Appellants] to tactically feign memory loss, to cripple or disadvantage the defense, and to obstruct the full and fair presentation of the defense.

*Id.* at 22-23.

\*\*\*

This court has searched precedent for comparable circumstances that would provide guidance on addressing the obstructive and vexatious conduct that occurred during this trial and the remedies for such conduct. Throughout the proceedings, the court was challenged to formulate a remedy that would not reward the perpetrators with a second bite at the apple and burden the defense with the expense of another trial. ***See Sutch v. Roxborough Mern. Hosp.,*** 142 A.3d 38, 52 (Pa. Super. 2016), *app. den.* 640 Pa. 378, 163 A.3d 399 (2016). This case presents the unique circumstances of compounded misconduct that included both clients and counsel, coupled with counsel engaging in blatant misrepresentations to the court on the record by counsel in the course of the trial. The underlying matter—luring an interpreter—which should involve a basic procedure devolved into a shameful cloak and dagger attempt to cover up the actions of both clients and counsel leading to repeated delays in the trial and necessitating the use of three different interpreters (remarkable,

when the Pre-trial Order issued in conjunction with the trial mandated that counsel retain an interpreter available for the entire duration of the trial).

*Id.* at 24.

***

Entering a JNOV would fully punish the wrongdoers and erase the taint, but, as previously discussed, it is outside the scope of the court's authority. ***Long v. Bethany Children's Home, Inc***., 2021 WL 1157945 at * 3 (Pa. Super. March 26, 2021). citing ***Reott v. Asia Trend Inc.***, 7 A.3d 830, 835 (Pa. Super. 2010), aff'd 618 Pa. 228, 55 A.3d 1088 (2012).  Granting an entirely new trial simply allows [Appellants] a "do-over" with the benefit of having previewed [Appellees'] cases.  However, limiting the scope of any new trial to the evidence credibly presented, *i.e.*, that some type of incident that occurred at the workplace at UCP on May 26, 2016 and the immediate injuries proven to flow from that incident—prevents [Appellants] from inflating the claims in this case and using expert testimony dependent upon an unscientifically confirmed causal nexus.  Moreover, it limits the ability of witnesses who have shown an inclination to manipulate the proceedings to their favor to embellish their account of the incident in pursuit of a jackpot.  Such a ruling is consistent both with the court's finding as to misconduct and its determination of an insufficiency in the underpinnings for the experts' conclusions.

*Id.* at 25.

***

[T]he misconduct here involved counsel and clients.  However, the misrepresentations and omissions related to the circumstances of hiring the original Court Interpreter are entirely the actions of counsel, warranting the entry of a separate sanction against him. [Counsel's] statements surrounding the hiring and firing of the Court Interpreter, the convenient absence of Mr. Garced, and the scheduling of Court Interpreters generally and the replacements for [the Interpreter], were, based upon his demeanor and duplicitous responses, wholly incredible, purposefully misleading and unremorseful.  The court orders a Sanction of $ 5,000 against [counsel] to be paid to [Appellees'] counsel as attorneys' fees.

- 43 -

The court further determines that an award against [Mr.] and Mrs. Garced for their participation in the conduct surrounding the hiring of the interpreter and thereafter their evasive responses under oath is further required. **Sutch** suggests that an appropriate measure of sanctions is the cost that an opposing party incurred to address the misconduct. In this case, it appears that such cost would encompass counsel's fees in connection with the deposition of the interpreter, the fees in conjunction with the filing of [Appellees'] counsel's bench memos on the remedy for the use of an interpreter appearing to have a conflict of interest and for the costs of filing post-trial motions seeking a new trial that could proceed (hopefully) without the misconduct.

*Id.* at 26-27.

We further reject Appellants' contention that the imposition of sanctions was improper because there was no direct order under which they could be held in contempt. Appellants misapprehend the basis upon which the court entered sanctions. The court imposed sanctions under 42 Pa.C.S.A. 2503(7), and not on any intentional disregard of a court order. Moreover, as Appellees correctly point out, an award of counsel fees under Section 2503 is distinct from a finding of civil contempt that might include sanctions in the form of counsel fees. *Carlino E. Brandywine, L.P. v. Brandywine Vill. Ass'n*, 197 A.3d 1189, 1204 (Pa. Super. 2018). Appellants are not entitled to any relief on this issue.

## VI. EVIDENTIARY ISSUES

In their remaining arguments, Appellants contend that the trial court committed errors in an array of evidentiary rulings. We review evidentiary rulings for abuse of discretion. *Talmadge v. Ervin*, 236 A.3d 1154, 1156 (Pa. Super. 2020). We review these arguments *seriatim*.

(i)    Taxes

Appellants argue they are entitled to a new trial because Appellees asked Appellants' economic expert inappropriate questions.   Specifically, Appellees asked whether, in calculating lost earning capacity, the wages the expert used factored in Appellants' taxes.

In **Gradel v. Inouye**, 421 A.2d 674 (Pa. 1980), our Supreme Court held that "the law in Pennsylvania plainly is that income tax consequences should not be considered by the jury. . . . Income tax as it relates to damages should be mentioned neither in argument nor in jury instructions." **Id.** at 680.  Under **Gradel**, it likely was improper for the court here to allow questions to Appellants' economic expert about whether he considered taxes in calculating lost earning capacity.  Any error, however, was harmless, since the jury did not award Appellants damages for loss of future earnings or earning capacity, and the court properly entered JNOV for future economic loss, as discussed above.

(ii)    Limitation of Mr. Garced's Testimony

Appellants argue that they are entitled to a new trial because the trial court limited Mr. Garced's direct testimony.  When Mr. Garced resumed his testimony on the fifth day of trial—after testifying for half a day on the first day—the trial court limited his direct testimony to ten minutes.  N.T., 10/4/21, at 6.  The trial court explained that it took this step because of the "time wasted [by Appellants] during trial, [counsel's] disorganized and repetitive

- 45 -

leading questions, multiple delays of the trial due to the firing of the original Interpreter, [and] failure to secure a replacement interpreter." Trial Court Memorandum, 12/7/21, at 30.

At the outset, we observe Appellants waived this issue for purposes of appeal because they did not object to the trial court's ruling. *Estate of Brown*, 30 A.3d 1200, 1207 (Pa. Super. 2011) ("failure to object in timely fashion at trial results in waiver of issue for appeal"). As the trial court pointed out in its opinion, the portion of the record Appellants cite to show they preserved this issue actually related to a different issue—Appellants' request that the trial judge recuse himself. When the court ruled that Mr. Garced's direct would be limited, counsel's only response to the time limitation was: "Yes, sir." *Id.* at 6. Then, after the court brought the jury in and read the curative instruction concerning the misconduct related to the interpreter, Appellants asked the trial judge to recuse himself. *Id.* at 19. This request did not concern the time limitation imposed on Mr. Garced's direct testimony. Even if Appellants preserved this issue, a trial court is authorized to control the scope of a witness's examination, *Rettger v. UPMC Shadyside*, 991 A.2d 915, 925 (Pa. Super. 2010), and the court here exercised this authority properly in placing a time limit on Mr. Garced's testimony. Mr. Garced's direct examination resumed a week after he testified at length on the first day of trial. This was after Appellants' misconduct with the interpreter, multiple delays, and repetitive leading questions, all were deemed to interfere with the

flow of the trial. At that point, the trial court limited Mr. Garced's further testimony to ten minutes due to Appellants' interference with the flow of trial caused by their misconduct concerning the interpreter and the resulting delay in obtaining a substitute interpreter. Memorandum Opinion, 12/7/21, at 30. In addition, Mr. Garced's testimony was duplicative of other witnesses, including his wife, who testified about his exposure, treatment, and damages, and Appellants' multiple damages experts. Accordingly, the court's limitation on Mr. Garced's testimony was a proper exercise of discretion.

(iii)    Admission of Past Medical Costs

Appellants request a new trial on the ground that the court erred in allowing Appellees to question Appellants' life care plan expert about Mr. Garced's past medication costs, when Appellants were not seeking to recover past medical costs. We find that this cross-examination was appropriate. On direct examination, Appellants' life care planner testified about projected future medical costs. On cross-examination, defense counsel challenged the planner's opinions by seeking information regarding the amount of Mr. Garced's past medical bills. This was permissible cross-examination, since past medical costs are relevant when future medical expenses are at issue. *Pratt v. Stein*, 444 A.2d 674, 697 (Pa. Super. 1982) ("[w]here the evidence in a personal injury action shows the value of medical services already rendered the injured person, and that such service will be required in the future, the jury may determine from the past service, and its value, what may

reasonably be required in the future, although there is no other evidence of the value of the future services"). Defense counsel's questions were proper to assist the jury to determine the amount, if any, Appellants could recover for future medical expenses. In addition, these questions were an appropriate challenge to the life care planner's opinions concerning future medical costs. The witness had no knowledge of the past cost of Mr. Garced's medications, so these questions directly impeached the credibility of her opinions. ***See*** Pa.R.E 611(b) (permitting cross-examination of a witness on matters relevant to any issue in the case, including credibility).

    (iv)    Scope of Dr. Kelsen Testimony

Appellants argue they are entitled to a new trial because a defense medical expert, Dr. Kelsen, was permitted to testify that the use of Xolair, a medication that Mr. Garced received in treatment following the incident at UCP, should have been limited to four months. According to Appellants, Dr. Kelsen failed to include this opinion in his report, so his testimony at trial fell outside the fair scope of his report. Appellees correctly point out, however, that Mr. Garced's use of Xolair was within the parameters of Dr. Kelsen's supplemental report provided to all counsel. Under Pennsylvania Rule of Civil Procedure 4003.5, expert reports define the permissible scope of a party's expert trial testimony. Pa.R.Civ.P. 4003.5(c) ("[The expert's] direct testimony at the trial may not be inconsistent with or go beyond the fair scope of his testimony in the discovery proceedings as set forth in his deposition, answer

to an interrogatory, separate report, or supplement thereto"). "[I]n determining whether an expert's trial testimony falls within the fair scope of his pre-trial report, the trial court must determine whether the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness." ***Feden v. Consolidated Rail Corp.***, 746 A.2d 1158, 1162 (Pa. Super. 2000). In other words,

> in deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from making a meaningful response, or which would mislead the adversary as to the nature of the appropriate response.

***Id.*** In his supplemental report, Dr. Kelsen opined that Xolair was not an appropriate treatment for Mr. Garced. Given his opposition to this medication, his trial testimony that any use of Xolair should be limited to four months was within the fair scope of his supplemental opinion.

(v) Termination of Mr. Garced's Contract

Appellants object to the court's order granting UCP's motion to preclude any reference to the termination of Mr. Garced's contract with UCP. This ruling was within the court's discretion. The agreement between UCP and Mr. Garced's company was an at-will contract. "The general rule is that when a contract provides that one party shall render services to another . . . but does not specify a definite time or prescribe conditions which shall determine the duration of the relation, the contract may be terminated by either at will."

*Price v. Confair*, 79 A.2d 224, 226 (Pa. 1951). Thus, UCP had the right to terminate this contract at any time. Permitting Appellants to introduce evidence of termination would have led the jury to speculate why the contract was terminated and would have introduced irrelevant collateral issues unrelated to Appellants' claim of lost income arising from the fogging incident at UCP.

(vi)   Exclusion of Rebuttal Video

Appellants contend a new trial is needed because the trial court precluded a rebuttal video they sought to present at trial. The videotape, which purportedly showed Mr. Garced's continuing pulmonary symptoms while he was active, was intended to rebut a defense video showing Mr. Garced engaging in various strenuous activities. Appellants produced this video to Appellees just before the trial. The trial court's decision to bar introduction of the video was within its discretion. "The purpose of the discovery rules is to prevent surprise and unfairness and to allow a trial on the merits." *Clark v. Hoerner*, 525 A.2d 377, 382 (Pa. Super. 1987). Permitting the video would have been unfairly prejudicial to Appellees. The video was not listed in Appellants' pretrial memorandum and was not provided to Appellees until the eve of trial. Further, preclusion of the video did not prevent Appellants from presenting their case, because the video was duplicative and cumulative of Appellants' testimony. Through testimony by Mr. Garced and others,

Appellants were able to present evidence that doing certain tasks, such as walking on stairs, caused Mr. Garced's blood oxygen level to drop.

(vii)   Motion in Limine Precluding Mrs. Garced's Injuries

Appellants lastly contend the trial court erred in granting Appellees' motion in limine precluding recovery of Mrs. Garced's claimed injuries resulting from exposure to HaloSpray because her expert did not use the words to "a reasonable degree of medical certainty" in her report.  Appellants contend the report clearly indicated that her expert's opinions were within a reasonable degree of medical certainty.  We disagree.  The trial court's order of September 28, 2021, precluding Mrs. Garced from presenting a personal injury claim was not based upon mere semantics, but rather was grounded upon the substantive basis that she too failed to provide competent expert testimony to establish causation.

Mrs. Garcia provided a one and a half page expert report from her primary care physician, Dr. Anita C. Lee, dated November 1, 2019, to substantiate her claim that she too suffered injury and long term effects from exposure to the HaloSpray that leaked into the room her husband was cleaning.  According to Dr. Lee's summary of Mrs. Garcia alleged chemical exposure, Mrs. Garced said that she was working with her husband on May 27, 2016, when he was exposed to a fog of Halomist.  She claimed to be in the vicinity and became exposed to the fog as well.  She initially had no symptoms but claimed to develop nausea, headache, and dizziness by the

time her husband was taken to the emergency room, even though she received no treatment at that time. She claimed to have noted the onset of shortness of breath soon after, as well as chest tightness and a nonproductive cough. She was seen by an ear, nose and throat physician with a negative examination. She denied heartburn, took no inhalers, and had no prior lung or asthma problems in the past. Dr. Lee reviewed the material data sheets for the chemical composition of Halomist and noted that those agents are known to be irritants to the mouth, throat, gastrointestinal tract, and lungs. Relying upon the 2016 record of Mrs. Garced's pulmonologist, Dr. Schwartz, which Dr. Lee stated she also confirmed, Dr. Lee noted that after Mrs. Garced's alleged exposure, her initial workup included "neg CXR, PFTs with methacholine challenge on 10/12/16 that was normal." After about a year, Mrs. Garced's condition started to improve, and Dr. Lee diagnosed nonspecific airway irritation/inflammation induced by her prior exposure. Dr. Lee noted there were some (but not all) days that Mrs. Garced woke up with shortness of breath subsequent to her exposure, and that she takes no medications for her symptoms. Dr. Lee stated that since the chemical exposure three years ago, Mrs. Garced's symptoms slowly resolved from an exposure from the same incident but to a lesser extent than Mr. Garced's exposure.

In light of our above discussion on the failure to establish causation between the May 26, 2016 incident and Mr. Garced's injuries, no further discussion is needed to conclude that the trial court acted within its discretion

in granting Appellees' motion *in limine* to preclude Mrs. Garced from making a personal injury claim related to the May 16, 2016 incident. Suffice it to say, Dr. Lee's nonspecific diagnosis of an airway irritation/inflammation, without any attempt purporting to meet the expert criteria under Pa.R.E. 702 for the admission of expert testimony to establish a causal connection to the May 26, 2016 incident, requires that we deny any relief on this claim.

## VII.  HALOSIL'S CROSS-APPEAL

Halosil attempts to present a "cross-appeal" in its brief arguing that the trial court erred by denying its motion to dismiss Appellants' claims against it on the ground that FIFRA preempts Appellants' entire action.  We find we are precluded from reviewing this contention because Halosil failed to file an appeal from the court's order disposing of its post-trial motions.

As discussed above, the court denied Halosil's motion seeking JNOV based upon FIFRA but awarded Appellants a new trial limited to the amount of Mr. Garced's past noneconomic loss. Halosil could have filed a notice of appeal from the denial of its FIFRA argument within 30 days of the order dismissing its post-trial motion, **see** Pa.R.A.P. 903(a), or a cross-appeal within 14 days of a timely notice of appeal filed by Appellants.  Pa.R.A.P. 903(b). Since Halosil did neither, we are precluded from entertaining the merits of its cross-appeal.

## VIII. CONCLUSION

For the foregoing reasons, we affirm the trial court's order disposing of the parties' post-trial motions, and we remand for further proceedings consistent with this decision.

Order affirmed.    Case remanded for further proceedings.    Jurisdiction relinquished.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date:  12/07/2023