J-A05003-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| ASHLEY MALDONADO | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| DEBORAH WISMER | : | No. 1670 EDA 2025 |

Appeal from the Judgment Entered June 23, 2025
In the Court of Common Pleas of Montgomery County Civil Division at
No(s):  2020-18896

BEFORE:  KUNSELMAN, J., NICHOLS, J., and SULLIVAN, J.

MEMORANDUM BY KUNSELMAN, J.:                **FILED JUNE 2, 2026**

Ashley Maldonado appeals from the judgment entered on June 23, 2025, after a civil jury trial related to a car accident where she was rear ended by Deborah Wismer.[1]  The jury returned a verdict in favor of Ms. Wismer, finding that Ms. Wismer's negligence was not a factual cause of any harm to Ms.

_____

[1] Ms. Maldonado appealed from the trial court's June 20, 2025 order denying her post-trial motion.  However, the appeal properly lies from the entry of judgment on June 23, 2025.  ***See Crosby v. Commonwealth, Dep't of Transp.***, 548 A.2d 281, 283 (Pa. Super. 1988).  Here, the jury verdict was returned on March 14, 2025, Ms. Maldonado filed her post-trial motion on March 21, and the trial court denied her motion on June 20.  On June 23, Ms. Maldonado filed a praecipe for entry of judgment in favor of Ms. Wismer and against Ms. Maldonado, which, according to the docket, was entered that same day.  Ms. Maldonado filed her notice of appeal, from the order denying her post-trial motion, on June 24.  Although "an appeal from an order denying post-trial motions is interlocutory . . . where, as here, judgment is subsequently entered, the appeal is 'treated as filed after such entry and on the date thereof.'"  ***K.H. v. J.R.***, 826 A.2d 863, 871-72 (Pa. 2003) (citation omitted).  Accordingly, we have adjusted the caption to reflect that Ms. Maldonado's appeal is from the June 23 judgment.

Maldonado. Ms. Maldonado challenges several evidentiary rulings and requests a new trial. After review, we affirm.

The trial court provided the following factual and procedural history in its opinion:

> Our timeline will begin with some events that occurred before the motor vehicle collision that gives rise to the lawsuit. It's disputed that on January 3, 2019, Ms. Maldonado went to the emergency room at Einstein Hospital—Montgomery ("Einstein Montgomery") due to miscarriage concerns. On January 8, 2019, Ms. Maldonado had an appointment with her OBGYN and there reported that she was feeling well. On February 10, 2019—five (5) days before the accident, Ms. Maldonado returned to Einstein for vaginal bleeding and then it was noted that she had a subchorionic hematoma,[2] an accumulation of blood between the uterine lining and the outer fetal membrane.
>
> On February 15, 2019, at approximately noon, Plaintiff, [Ms. Maldonado], then 28 years old and pregnant with twins—was operating a motor vehicle on Ridge Pike in Plymouth Meeting, Montgomery County, Pennsylvania. While stopped at a red light, Ms. Maldonado was rear-ended by Defendant, [Ms. Wismer]. Ms. Maldonado alleges that she suffered serious injuries as a result of the accident, including a miscarriage of 14-week-old twin fetuses, emotional trauma due to pregnancy loss, and orthopedic injuries. Ms. Maldonado was governed by a limited tort option, selected when she obtained her motor vehicle insurance policy. Because of her selection of the limited tort option, she was eligible to recover pain and suffering damages in the event that she was injured in a motor vehicle accident, only if the injuries were found to be serious. Ms. Wismer, though she stipulated to being

_____

[2] This is referred to as a subchorionic hematoma or a subchorionic hemorrhage throughout the record. It appears that the words "hematoma" and "hemorrhage" were used interchangeably by the parties throughout the litigation. Thus, we understand both words to be referring to the same thing. For clarity, we use "subchorionic hemorrhage" in our analysis.

- 2 -

negligent, denied that the accident caused the miscarriage, or any other serious bodily injuries that would entitle Ms. Maldonado to recover non-economic damages such as pain and suffering damages.

Ms. Maldonado returned to the emergency room following the motor vehicle collision on February 15, 2019, and was discharged in the earlier hours of the following morning. On February 17, 2019, two days after the collision, Ms. Maldonado suffered a miscarriage of her twin fetuses. Ms. Maldonado's experts opined that the pregnancy loss was caused by the February 15, 2019 accident, while the defense experts found that a combination of risk factors (short interval pregnancy, angular pregnancy, a high [white blood cell] count, and previous miscarriage) ultimately led to Ms. Maldonado's miscarrying.

[. . .]

[S]everal motions in limine were filed, many of which raised similar and identical arguments to the ones raised by Ms. Maldonado in this [post-trial] Motion. Counsel for both parties attended oral argument on those motions in limine on February 26, 2025. This court ruled on the motions in limine on February 28, 2025.

Trial Court Opinion (T.C.O.), 6/20/25, at 2-4 (internal citations omitted; "Court" adjusted to "court").

After the court decided the motions *in limine*, the case proceeded to a jury trial. Pertinent to the issues raised in this appeal, at trial, Ms. Maldonado presented the testimony of an expert witness, Dr. Burke, who opined that the car accident caused Ms. Maldonado's miscarriage. Conversely, Ms. Wismer presented the testimony of her own expert witness, Dr. Goldberg, who opined that the car accident did not cause Ms. Maldonado's miscarriage. The jury ultimately returned a verdict in favor of Ms. Wismer and against Ms.

Maldonado, finding that Ms. Wismer's negligence was not a factual cause of any harm to Ms. Maldonado.

Thereafter, Ms. Maldonado filed a post-trial motion, which the trial court denied. Ms. Maldonado then timely filed this appeal.[3] Although her Appellate Rule 1925(b) concise statement lists fourteen alleged errors, she presents only the following four issues for our review:

1. Did the trial court abuse its discretion and commit reversible error when it failed to preclude Dr. Jay Goldberg from testifying or give a corrective instruction regarding Dr. Goldberg's conflict of interest, stemming from being the vice chairman and director of research of OBGYN at Einstein when Ms. Maldonado's treatment was under Einstein OBGYN?

2. Did the trial court abuse its discretion and commit a reversible error when it failed to preclude Dr. Jay Goldberg's testimony that went beyond the scope of his reports, regarding testimony on the subchorionic hemorrhage and ectopic pregnancy that was never mentioned in his reports, which resulted in serious prejudice to Ms. Maldonado?

_____

[3] The certified record includes only the transcripts from the hearing on the motions *in limine* and the hearing on the post-trial motion. It does not include the transcripts from the jury trial. It is well settled that the burden is ultimately on the appellant to ensure that the record is complete on appeal. *See* Pa.R.A.P. 1921, Note; *see also, e.g., Mazzarese v. Mazzarese*, 319 A.3d 586, 596 (Pa. Super. 2024). It is also well settled that this Court may review and consider only items that are part of the certified record. *See, e.g., Mazzarese*, 319 A.3d at 596. However, "where the accuracy of a document is undisputed and contained in the reproduced record, we may consider it." *Commonwealth v. Holston*, 211 A.3d 1264, 1276 (Pa. Super. 2019) (*en banc*) (citations omitted); *see also* Pa.R.A.P. 1921, Note. Neither party disputes the accuracy of the transcripts included in the reproduced record, and both parties cite to the reproduced record. Thus, we will consider the transcripts even though they are not included in the certified record.

3. Did the trial court abuse its discretion and commit [reversible error] by allowing Dr. Jay Goldberg's opinions [to] be presented to the jury when it lacked requisite certainty, especially with regard to the phantom "infection" and was a net opinion and failed to conform with the Frye standard?

4. Did the trial court abuse its discretion and commit [reversible error] by allowing Dr. Goldberg's opinion pertaining [to] the photographs of the accident when Dr. Goldberg himself admitted he had no expertise in accident reconstruction or biomechanical engineering, while at the same time precluding Ms. Maldonado's counsel from impeaching Dr. Goldberg with evidence of the repair estimate?

Ms. Maldonado's Brief at 6 (suggested answers omitted).

Our standard of review for a trial court's denial of a motion for a new trial is,

> whether the trial court clearly and palpably committed an error of law that controlled the outcome of the case or constituted an abuse of discretion. In examining the evidence in the light most favorable to the verdict winner, to reverse the trial court, we must conclude that the verdict would change if another trial were granted. [. . .]

***Heffelfinger v. Shen***, 342 A.3d 711, 720 (Pa. Super. 2025), *appeal denied*, 2026 WL 263279 (Pa. 2026) (citation omitted). If "there is any support in the record for the trial court's decision to deny a new trial, that decision must be affirmed." ***Oxford Presbyterian Church v. Weil-McLain Co., Inc.***, 815 A.2d 1094, 1099 (Pa. Super. 2003) (citation omitted).

Ms. Maldonado claims she is entitled to a new trial based on four improper evidentiary rulings by the trial court. When reviewing a trial court's evidentiary rulings, our standard of review is as follows:

> The admission or exclusion of evidence, including the admission of testimony from an expert witness, is within the sound discretion of the trial court. Thus, our standard of review is very narrow; we may only reverse upon a showing that the trial court clearly abused its discretion or committed an error of law. To constitute reversible error, an evidentiary ruling must not only be erroneous, but also harmful or prejudicial to the complaining party.

*Crespo v. Hughes*, 167 A.3d 168, 181 (Pa. Super. 2017) (citation and brackets omitted). Similarly, our standard of review for a trial court's decision to grant or deny a motion *in limine* is "an evidentiary abuse of discretion standard of review." *Parr v. Ford Motor Co.*, 109 A.3d 682, 690 (Pa. Super. 2014) (*en banc*) (citation omitted). We will review each of her four issues using this standard.

In her first issue, Ms. Maldonado argues that Dr. Goldberg should have been conflicted out of this case and barred from testifying because, as the vice chairman and director of research of OBGYN at Einstein, he was the manager, supervisor, or boss of the doctors and nurses who provided her care at Einstein Montgomery. *See* Ms. Maldonado's Brief at 23-24. Ms. Maldonado asserts that, at the very least, the trial court should have given the jury a corrective instruction that Dr. Goldberg was not speaking for Einstein when he opined that Ms. Maldonado's miscarriage was unrelated to the car accident. *See id.* According to Ms. Maldonado, Dr. Goldberg testifying wrongly conveyed to the jury that Einstein Health, Ms. Maldonado's treating doctor, had determined that the miscarriage was unrelated to the accident. *Id.* at 24.

- 6 -

The trial court explained its decision to permit Dr. Goldberg to testify as follows:

> While the two hospitals [the one where Ms. Maldonado received her treatment and the one where Dr. Goldberg works] are a part of the Einstein Healthcare Network, this court did not find that Dr. Goldberg was a treating physician to Ms. Maldonado. He was not involved in any of her treatment and does not work at the location where her treatment was rendered. This motion was denied as a motion in limine, and Ms. Wismer's Counsel was allowed to present Dr. Goldberg to testify at trial. Further, this argument does not warrant a new trial.

T.C.O. at 5 ("Court" adjusted to "court").

Pennsylvania law generally limits the information a party's treating physician may share in a case, and, therefore, the role they can play at trial. *See Marek v. Ketyer*, 733 A.2d 1268, 1269-70 (Pa. Super. 1999); *Mertis v. Oh*, 317 A.3d 529, 545 (Pa. 2024). In part, this is because a treating physician may only reveal information about their patient, with their patient's consent. *See Marek*, 733 A.2d at 1269-70.

Pennsylvania Rule of Civil Procedure 4003.6 addresses discovery of a treating physician. It provides the general rule that information "may be obtained from the treating physician of a party only upon written consent of that party or through a method of discovery authorized by this chapter." Pa.R.Civ.P. 4003.6(a). Thus, we must determine whether Dr. Goldberg was Ms. Maldonado's treating physician.

Here, Ms. Maldonado's argument that he was her treating physician is belied by the record. Although Ms. Maldonado went to Einstein Montgomery

for treatment, Dr. Goldberg testified that his "entire clinical practice" was at Jefferson Einstein Philadelphia Hospital. N.T., 3/7/25, at 19. Dr. Goldberg explained that he had never seen patients and had never practiced at Einstein Montgomery, although he believed it was now also part of the larger Jefferson network. *See id.* Dr. Goldberg stated that he did not have any responsibilities at Einstein Montgomery. *Id.* at 22. He also testified that he did not believe he had ever spoken with, met, or examined Ms. Maldonado, and to his knowledge, he had never spoken with or met any of her treating doctors. *Id.* at 86.

Further, the only evidence Ms. Maldonado cites to support her claim that Dr. Goldberg should not have been permitted to testify is that he held hospital privileges at Einstein Montgomery. *See* Ms. Maldonado's Brief at 23. However, Dr. Goldberg testified that he did not know if he still held privileges at Einstein Montgomery. *See* N.T., 3/7/25, at 19. More importantly, there was no evidence that Dr. Goldberg communicated with Ms. Maldonado's treating physicians about her care, that he rendered services in her treatment, or that he billed Ms. Maldonado for his services. *See Marek*, 733 A.2d at 1269. Thus, we fail to see how he could be considered her treating physician merely because he was a high-ranking employee of the hospital network where Ms. Maldonado received care. *See id.* We discern no abuse of

discretion in the trial court permitting Dr. Goldberg to testify.[4]   Ms. Maldonado's first issue merits no relief.

In her second issue, Ms. Maldonado argues that the trial court abused its discretion by permitting Dr. Goldberg to testify outside the scope of his report and to reverse opinions contained in his report at trial.  Ms. Maldonado's Brief at 25.   Ms. Maldonado asserts that her prior ectopic pregnancy and

_____

[4] We observe that Ms. Maldonado did not request that the trial court give a limiting instruction regarding Dr. Goldberg's testimony in her motion *in limine*; she instead requested that his testimony be precluded entirely.   At oral argument before the trial court on the motions *in limine*, Ms. Maldonado's counsel argued that the false sense of authority created by Dr. Goldberg's position at Einstein could not "even be corrected by a curative instruction." N.T., 2/26/25, at 66.  At the end of the trial, although Ms. Maldonado's counsel asked for an adverse inference instruction related to a different witness, counsel never asked the court to give a curative instruction related to Dr. Goldberg's testimony.  **See generally** N.T., 3/13/25, at 8-26.   Counsel admitted at oral argument before this Court that he did not request a corrective instruction.   Thus, the first time Ms. Maldonado raised an issue related to the trial court failing to give a limiting instruction was in her post-trial motion, where she noted that the "court failed to give any kind of limiting instruction."  Motion for Post-Trial Relief, 3/21/25, at 6.  However, because she did not request that instruction at a time when the trial court could have given it, she has waived this argument.  **See Garced v. United Cerebral Palsy of Philadelphia & Vicinity**, 307 A.3d 103, 130 (Pa. Super. 2023), *appeal denied*, 327 A.3d 617 (Pa. 2024) (citing **Estate of Brown**, 30 A.3d 1200, 1207 (Pa. Super. 2011) for the proposition that "failure to object in timely fashion at trial results in waiver of issue for appeal"); Pa.R.Civ.P. 227.1(b)(1) ("post-trial relief may not be granted unless the grounds therefor, if then available, were raised in pre-trial proceedings" or an appropriate method at trial).

Even if not waived, Ms. Maldonado fails to cite any evidence indicating that the jury would have believed Dr. Goldberg was speaking for Einstein Montgomery or the entire Einstein network when giving his professional opinions.  Instead, the jury heard Dr. Goldberg testify, as described *infra*, that he was not connected to Einstein Montgomery.  Thus, Ms. Maldonado would not be entitled to relief for the lack of a corrective instruction.

subchorionic hemorrhage were not directly connected to injuries she sustained in the car accident, so they should have been excluded as irrelevant and unfairly prejudicial. *See id.* Ms. Maldonado claims that Dr. Goldberg's testimony about her subchorionic hemorrhage exceeded the scope of his reports, as he never mentioned her subchorionic hemorrhage in his reports. *See id.* at 30. Moreover, in his reports, Dr. Goldberg stated that there was no evidence of a placental abruption, but then he testified that there was a placental abruption that happened before the crash. *Id.* at 29. Thus, she claims Dr. Goldberg reversed his opinions at trial regarding the placental abruption,[5] and that she was "egregiously prejudiced." *See id.*

Conversely, Ms. Wismer argues that this part of Dr. Goldberg's testimony was offered to rebut the testimony of Dr. Burke, who discussed Ms. Maldonado's subchorionic hemorrhage on direct examination. *See* Ms. Wismer's Brief at 13. In reply, Ms. Maldonado counters by stating that if the trial court had correctly ruled on Ms. Maldonado's motion *in limine* to exclude Dr. Goldberg from commenting on the subchorionic hemorrhage, her counsel would have never asked Dr. Burke about it. *See* Ms. Maldonado's Reply Brief

---

[5] We note that Ms. Maldonado objected to Dr. Goldberg's testimony at trial regarding the placental abruption because it was "listed absolutely nowhere" in his reports. *See* N.T., 3/7/25, at 47. Counsel did not argue that Dr. Goldberg had reversed his opinion about the placental abruption at trial. The first time Ms. Maldonado raised this argument was in her post-trial motion. Thus, we would have cause to find it waived. *See Garced*, 307 A.3d at 130; Pa.R.Civ.P. 227.1(b)(1). Nevertheless, because counsel objected to Dr. Goldberg's testimony related to the placental abruption, albeit for a different reason, and we must already analyze whether Dr. Goldberg testified outside the scope of his report, we decline to find waiver in this instance.

at 2. In that situation, Dr. Burke would not have testified about the subchorionic hemorrhage, and presumably there would have been nothing for Dr. Goldberg to rebut.

Under Pennsylvania Rules of Civil Procedure, an expert's trial testimony may not go beyond the fair scope of his expert report. *See* Pa.R.Civ.P. 4003.5(c); *Garced v. United Cerebral Palsy of Philadelphia & Vicinity*, 307 A.3d 103, 131 (Pa. Super. 2023), *appeal denied*, 327 A.3d 617 (Pa. 2024) (citation omitted). Subsection (c) of the applicable Rule specifies:

> (c) To the extent that the facts known or opinions held by an expert have been developed in discovery proceedings under subdivision (a)(1) or (2) of this rule, the direct testimony of the expert at the trial may not be inconsistent with or go beyond the fair scope of his or her testimony in the discovery proceedings as set forth in the deposition, answer to an interrogatory, separate report, or supplement thereto. However, the expert shall not be prevented from testifying as to facts or opinions on matters on which the expert has not been interrogated in the discovery proceedings.

Pa.R.Civ.P. 4003.5(c).

To determine whether an expert's trial testimony is within the fair scope of his pre-trial report, this Court has explained,

> the trial court must determine whether the report provides sufficient notice of the expert's theory to enable the opposing party to prepare a rebuttal witness. In other words, in deciding whether an expert's trial testimony is within the fair scope of his report, the accent is on the word "fair." The question to be answered is whether, under the particular facts and circumstances of the case, the discrepancy between the expert's pre-trial report and his trial testimony is of a nature which would prevent the adversary from making a meaningful response, or which

- 11 -

would mislead the adversary as to the nature of the appropriate response.

***Garced***, 307 A.3d at 131-32 (citations, brackets, and some quotation marks omitted). Importantly, a "fully realized defense includes the presentation of an expert witness to rebut the evidence offered by the opposing party." ***Schweikert v. St. Luke's Hosp.***, 886 A.2d 265, 268 (Pa. Super. 2005) (citation omitted). Moreover, an "expert is permitted to provide a reasonable explanation, or an enlargement of the report, if the expert's subsequent testimony remains within the report's scope." ***Lewis v. Reading Hosp.***, 345 A.3d 257, 269 (Pa. Super. 2025), *reargument denied* (Nov. 2025) (citation omitted).

Here, the trial court explained its rationale for permitting Dr. Goldberg's testimony as follows:

> In this case, the testimony from Dr. Goldberg was presented by the defense after Ms. Maldonado had rested their case-in-chief, which included the testimony of their expert, Dr. Burke. Further, Dr. Burke testified regarding Ms. Maldonado's February 10, 2019 visit and concluded that the cramping and vaginal bleeding that Ms. Maldonado experienced that day did not contribute to the miscarriage, pointing instead to the motor vehicle accident. The testimony of Dr. Goldberg was presented after this, and Ms. Maldonado's Counsel had ample opportunity to cross-examine the witness. This court, therefore, finds that allowing Dr. Goldberg to testify about the information contained in the February 10, 2019 emergency room records did not cause unfair surprise to Ms. Maldonado or her counsel.

T.C.O. at 7-8 (citation omitted; "Court" adjusted to "court").

Upon review, we discern no abuse of discretion in the trial court's admission of Dr. Goldberg's testimony. In Dr. Goldberg's first report, he explained that Ms. Maldonado's pregnancy was complicated for several reasons, which rebutted Dr. Burke's opinion. **See** Dr. Goldberg's Report, 2/19/20, at 2-3. In his second report, Dr. Goldberg explained that he had received additional materials since completing his first report, including records of the Einstein Healthcare Network and Einstein Medical Center Montgomery. Dr. Goldberg's Report, 7/17/21, at 1. He again rebutted various assertions made by Dr. Burke. **See id.** at 2-4. In both reports, Dr. Goldberg opined that the car accident was not casually related to the miscarriage. Thus, based on Dr. Goldberg's reports, Ms. Maldonado was aware of Dr. Goldberg's theory that the car accident did not cause the miscarriage.

Although Dr. Goldberg's reports mentioned Ms. Maldonado's prior ectopic pregnancy, we agree that his reports made no mention of the subchorionic hemorrhage. Nevertheless, this omission did not mislead Ms. Maldonado or prevent her from making a meaningful response, because Dr. Goldberg's theory was always clear—that the car accident did not cause the miscarriage. **Garced, supra**; **see also Daddona v. Thind**, 891 A.2d 786, 809 (Pa. Cmwlth. 2006) ("Contrary to Plaintiffs' assertions, the mere fact that the words "diffuse axonal injury" do not appear in Dr. Banks' pre-trial report does not automatically require exclusion of this testimony." (citations omitted)). In reaching this conclusion, Dr. Goldberg merely testified to other factors that he believed contributed to Ms. Maldonado's miscarriage, including

- 13 -

the subchorionic hemorrhage.[6] *See Schaaf v. Kaufman*, 850 A.2d 655, 666–67 (Pa. Super. 2004), *abrogated on other grounds*, *Pringle v. Rapaport*, 980 A.2d 159 (Pa. Super. 2009) (*en banc*), as recognized in *Passarello v. Grumbine*, 87 A.3d 285 (Pa. 2014)). In *Schaaf*, this Court explained that the defense's expert did not testify beyond the fair scope of his report when he testified to other potential causes of the plaintiff's husband's stroke rather than atrial fibrillation. The plaintiff could properly prepare a defense because something must have caused the stroke. Therefore, the plaintiff's experts

_____

[6] We observe that Ms. Maldonado cites page 462 of the reproduced record to support her claim that Dr. Goldberg testified that Ms. Maldonado's prior ectopic pregnancy increased her risk for a miscarriage. *See* Ms. Maldonado's Brief at 28 (citing "RR000462"). However, this mischaracterizes Dr. Goldberg's testimony. On page 462 of the reproduced record, the only reference Dr. Goldberg made to an ectopic pregnancy was related to Ms. Maldonado's angular pregnancy. Dr. Goldberg attempted to explain what an angular pregnancy was by stating, "people have probably heard of what's called [] a tubal pregnancy or ectopic pregnancy, where the pregnancy's located within the fallopian tube. So this pregnancy [the angular pregnancy] is more within the uterine cavity . . . ." N.T., 3/7/25, at 35. Thus, Ms. Maldonado's representation that this testimony was related to her previous ectopic pregnancy and that Dr. Goldberg correlated that to her miscarriage is false. Otherwise, Ms. Maldonado fails to provide any other citations to the record where Dr. Goldberg testified that her prior ectopic pregnancy put her at a higher risk for a miscarriage. Our review of the record shows that Dr. Goldberg testified that Ms. Maldonado had many risk factors for miscarrying including the subchorionic hemorrhage, the high white blood cell count and possible infection, the angular pregnancy, the short pregnancy interval between her last pregnancy and the twin pregnancy, and the type of twin pregnancy she was carrying. However, he did not testify that her previous ectopic pregnancy was one of the factors that contributed to her miscarriage. Thus, to the extent Ms. Maldonado asserts that Dr. Goldberg testified outside the scope of his report regarding the ectopic pregnancy, that such testimony was irrelevant, or that she was prejudiced by that testimony, her argument fails because it appears that Dr. Goldberg did not discuss her prior ectopic pregnancy at trial.

should have known the other possible causes and prepared accordingly. Because the defense's expert simply listed other possible causes, it was not beyond the fair scope of his opinion that atrial fibrillation did not cause it.

Likewise, here, Dr. Goldberg listed in his reports that he had reviewed Ms. Maldonado's medical records, which included information on her prior ectopic pregnancy and the subchorionic hemorrhage. *See Daddona* 891 A.2d at 809 (explaining that the expert's pre-trial report clearly indicated that he had reviewed the plaintiff's medical records, where the diagnostic tests were performed. Thus, his testimony about the diagnostic tests was not beyond the scope of his report.). Therefore, Ms. Maldonado knew these conditions might be discussed at trial.

Moreover, Dr. Goldberg's testimony on this issue was offered in rebuttal to Ms. Maldonado's case-in-chief. There, Ms. Maldonado's expert, Dr. Burke, discussed the subchorionic hemorrhage and opined that it was not an unusual finding and generally had no clinical significance at that time in pregnancy. *See* N.T., 3/6/25, at 29, 88. Dr. Burke also confirmed that Dr. Goldberg's reports had not said anything about Ms. Maldonado's February 10 emergency room visit or the subchorionic hemorrhage. *See id.* at 86. Dr. Burke disputed the significance of the subchorionic hemorrhage. *See id.* at 86, 88.

Dr. Goldberg's testimony related to the subchorionic hemorrhage came after Ms. Maldonado rested, as part of Ms. Wismer's defense. Ms. Maldonado's counsel cross-examined Dr. Goldberg, extensively, about whether the February 10 emergency room visit or the subchorionic hemorrhage were listed

in his reports. **See** N.T., 3/7/25, at 59-62, 68-72. Because Dr. Burke had already testified about the subchorionic hemorrhage, Dr. Goldberg was permitted to rebut his opinions. **See Risperdal Litig. W.C. v. Janssen Pharm., Inc.**, 174 A.3d 1110, 1120 (Pa. Super. 2017), *reargument denied* (Jan. 2018) (noting that "an expert's opinion offered in response to other testimony presented at trial need not be addressed in the expert's report." (citation omitted)).

As for the placental abruption and Ms. Maldonado's assertion that Dr. Goldberg reversed his opinion at trial, we disagree. In his pre-trial reports, Dr. Goldberg stated that there was no evidence of direct abdominal trauma from the seat belt during the minor car accident, and that there was no later evidence of a placental abruption. **See** Dr. Goldberg's Report, 2/19/20, at 3; Dr. Goldberg's Report, 7/17/21, at 3.

Then at trial, Dr. Burke testified conversely during the case in chief; Dr. Burke opined that the car accident caused a placental abruption from the seat belt which led to Ms. Maldonado's miscarriage. During the defense, Dr. Goldberg was asked if he agreed with Dr. Burke's assertions regarding the placental abruption. He explained that he disagreed with Dr. Burke, and he did not believe the car accident caused a placental abruption, which aligned with his reports. Dr. Goldberg further explained that the placenta had already been disrupted before the accident because of the subchorionic hemorrhage. N.T., 3/7/25, at 46-47.

Thus, it does not appear that Dr. Goldberg "completely reversed" his opinions at trial. Instead, it appears that in his reports, he believed the car accident did not cause a placental abruption. At trial, he explained that the subchorionic hemorrhage was a placental abruption that occurred before the accident. Further, Dr. Goldberg consistently opined in both of his reports and at trial that the car accident did not cause the miscarriage. Dr. Goldberg merely rebutted Dr. Burke's assertions regarding the placental abruption, which he was permitted to do, with testimony that went beyond the scope of his reports. *See Risperdal, supra*.

Even if we concluded that Dr. Goldberg reversed his opinion regarding the placental abruption at trial, Ms. Maldonado has failed to persuade us of any prejudice. Ms. Maldonado was aware of Dr. Goldberg's theory such that she could, and did, provide a meaningful response and a fully realized counterargument to this theory, via Dr. Burke's testimony, Dr. Goldberg's cross-examination, and other evidence. *See Garced, supra; Schweikert, supra*. In fact, Ms. Maldonado's counsel conceded to the trial court that Dr. Burke's testimony had rebutted Dr. Goldberg's opinion on the subchorionic hemorrhage, but counsel "would have had [Dr. Burke] formally rebut it in his report and write it out," if he had known in advance. *See* N.T., 3/12/25, at 84. Given that the jury heard Dr. Burke's testimony rebutting Dr. Goldberg's opinion, Ms. Maldonado's claim of prejudice fails.

Similarly, given the contents of Ms. Wismer's pre-trial statement, Ms. Maldonado's assertion of unfair surprise at trial is also unpersuasive. We note

- 17 -

that the "purpose of a pre-trial statement is to prevent surprise." ***Bainhauer v. Lehigh Valley Hosp.***, 834 A.2d 1146, 1154 (Pa. Super. 2003), *appeal denied*, 860 A.2d 121 (citation omitted; hyphen added). Here, Ms. Wismer's pre-trial statement, filed on September 30, 2024, discussed Ms. Maldonado's prior miscarriage in 2017 and the subchorionic hemorrhage. ***See*** Defendant's Pre-Trial Memorandum, 9/30/24, at 4.

In fact, at the pre-trial hearing on the motions *in limine*, Ms. Maldonado's counsel stated that the "only reason" he knew to include the subchorionic hemorrhage in the motion was because it was in Ms. Wismer's pre-trial statement, so he "***knew they were going to argue it***." ***See*** N.T., 2/26/25, at 48 (emphasis added). Based on the timing of Ms. Wismer's pre-trial statement, Ms. Maldonado was aware, months in advance of trial, that Ms. Wismer intended to discuss her prior miscarriage and the subchorionic hemorrhage. Thus, any assertion that she was prejudiced by being unprepared to counter that evidence at trial must fail.

Lastly, Ms. Maldonado cites ***Wilkes-Barre Iron & Wire Works, Inc. v. Pargas of Wilkes-Barre, Inc.***, 502 A.2d 210 (Pa. Super. 1985) to support her argument that she was prejudiced by Dr. Goldberg's reference to facts outside of his report. She claims ***Wilkes-Barre*** is factually similar and instructive here. We disagree.

In ***Wilkes-Barre***, a products liability case, the Wilkes-Barre Iron plant was damaged when a liquid propane cylinder supplied by Pargas of Wilkes-Barre exploded. ***Wilkes-Barre***, 502 A.2d at 210. Wilkes-Barre claimed that

the liquid propane cylinder was defectively designed because it lacked a protective collar around the valve. *Id.* at 211. Wilkes-Barre's expert stated in his report that the cylinder needed a protective collar but did not specify how the protective collar should be attached. *Id.* at 212. At trial, the expert testified that the cylinder was defective because the collar was not permanently welded on. *Id.*

This Court explained that Pargas was prejudiced by the discrepancy in the expert's report and his trial testimony. *Id.* at 213. Since the expert's report stated that the cylinder was defective because it lacked a protective collar, Pargas was prepared to defend that claim with evidence that the cylinder was equipped with a removable collar when it was delivered. *Id.* However, because the expert then testified that the collar needed to be welded on, Pargas was misled in the preparation of its defense. *Id.* In other words, Pargas could not defend against the fact that its cylinder's collar was not welded on because it did not know before trial that Wilkes-Barre would claim the cylinder was also defective for that reason.

Conversely, here, as explained above, Ms. Maldonado was not misled in the preparation of her defense. She knew that Dr. Goldberg was going to testify that the car accident did not cause her miscarriage for various reasons, many of which he listed in his report. She was prepared with Dr. Burke's testimony, who rebutted Dr. Goldberg's opinions by testifying that the car accident did not cause the miscarriage and that the other factors noted by Dr. Goldberg were insignificant. This is markedly different from ***Wilkes-Barre***,

where the expert's testimony supplied a new and different definition of design defect that surprised the appellee. *Id.*

Moreover, the procedural posture of **Wilkes-Barre** also differed from this case. There, the trial court **granted** Pargas's motion for a new trial, holding that Wilkes-Barre's expert witness's testimony **exceeded** the fair scope of his pre-trial report. *Id.* at 211 (emphasis added).

Here, however, the trial court **denied** Ms. Maldonado's motion for a new trial and held that Dr. Goldberg's testimony **did not exceed** the fair scope of his reports. In both instances, the appellate court reviews the trial court's decision for an abuse of discretion. It was the trial court's purview to determine the fair scope of the expert's testimony in the first instance. Thus, although the trial court in **Wilkes-Barre** found the expert exceeded his report, the trial court here reached the opposite conclusion. Both can be correct. Thus, **Wilkes-Barre** is not dispositive here. Ms. Maldonado had to prove to us that the trial court abused its discretion, which she failed to do.

In her third issue, Ms. Maldonado primarily challenges Dr. Goldberg's opinion that she "possibly" had an infection, based on her white blood cell count. **See** Ms. Maldonado's Brief at 35. She claims this was a "net opinion" because it was unsupported by facts, and it should have been precluded. **See** **id.** at 33 (citations omitted). According to Ms. Maldonado, Dr. Goldberg's opinions were unsupported by evidence, and, thus, did not meet the requirements for acceptable scientific methodology. **See id.** at 35 (citations omitted). Ms. Maldonado asserts that because her treating physicians had

ruled out an infection through multiple tests, Dr. Goldberg "fabricated" an infection. *See id.* at 36. Ms. Maldonado also makes a passing reference, in one sentence without further development, to Dr. Goldberg's additional opinion that there was "no trauma during pregnancy." *Id.* at 37. She claims the trial court abused its discretion to allow this testimony.

Pennsylvania Rule of Evidence 702 governs the admissibility of testimony from expert witnesses. It provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a) the expert's scientific, technical, or other specialized knowledge is beyond that possessed by the average layperson;
>
> (b) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; and
>
> (c) the expert's methodology is generally accepted in the relevant field.

Pa.R.E. 702. The comment explains that this rule "does not change the requirement that an expert's opinion must be expressed with reasonable certainty." *Id.* at Comment (citation omitted). Our Supreme Court recently reiterated this standard as follows: "Pennsylvania law is unmistakably clear. Our case law, evidentiary rules, and supporting secondary materials require that an expert hold his or her opinion to a reasonable degree of certainty in order to be admissible in legal proceedings." ***Commonwealth v. Fitzpatrick***, 349 A.3d 835, 861 (Pa. 2026).

Here, the trial court found "that Dr. Goldberg rendered his opinions with the requisite certainty required by law concerning the opinions of trial experts. Further, the very nature of litigation and the adversarial process lends itself to the presentation at trial of competing versions and theories." T.C.O. at 9.

Our review of the reports indicates that Dr. Goldberg stated in both reports that all his opinions were "stated with a reasonable degree of medical certainty." **See** Dr. Goldberg's Report, 2/19/20; Dr. Goldberg's Report, 7/17/21. Additionally, Dr. Goldberg testified at trial that all his opinions were made to a reasonable degree of medical certainty. N.T., 3/7/25, at 25, 58. Specifically, Dr. Goldberg opined that the car accident did not cause Ms. Maldonado to miscarry, and even if she had not been in the car accident, she still would have miscarried. **Id.** at 25, 58-59. Dr. Goldberg explained that Ms. Maldonado had many risk factors for miscarrying. **See id.** at 159. One of those factors was Ms. Maldonado's elevated white blood cell count which was possibly consistent with an infection that would have contributed to the pregnancy loss. **See id.** at 50, 110-11; Dr. Goldberg's Report, 2/19/20; Dr. Goldberg's Report, 7/17/21.

Contrary to Ms. Maldonado's argument, we disagree that Dr. Goldberg's use of the word "possibly" rendered his opinion inadmissible. Dr. Goldberg admitted that he did not know for certain whether Ms. Maldonado had an infection, but her white blood cell count was consistent with one. **See** N.T., 3/7/25, at 110. Ms. Maldonado's white blood cell count was a fact in evidence

within her medical records. *See id.* at 111. Thus, Dr. Goldberg's opinion was not unsupported by facts or evidence.

Again, Dr. Goldberg did not state with certainty that Ms. Maldonado had an infection. Instead, he reviewed her medical records and explained his thoughts about the significance of her white blood cell count. He also explained that her treating physicians "did not do an amniocentesis, where they could have put the needle in and got out amniotic fluid, to see if there [was] bacteria in there, because she soon thereafter passed the fetuses. So we don't know if there was an infection for sure or not." *Id.* at 125.

Additionally, Ms. Maldonado's counsel cross-examined Dr. Goldberg extensively about his opinions regarding her white blood cell count and a possible infection. Ms. Maldonado's counsel also asked her own expert, Dr. Burke, about the white blood cell count and a possible infection, and Dr. Burke explained both. N.T., 3/6/25, at 51-53. Thus, the jury heard Dr. Goldberg's fact-supported opinion that the car accident did not cause the miscarriage and that Ms. Maldonado had a possible infection. The jury also heard Dr. Burke's contrary opinions. It was the jury's function to discern the facts and render a verdict. Because the trial court did not abuse its discretion in admitting Dr. Goldberg's expert testimony, Ms. Maldonado's third issue merits no relief. *See Crespo, supra.*

In her fourth issue, Ms. Maldonado argues that the trial court abused its discretion by permitting Dr. Goldberg to give a lay opinion related to lack of damage to Ms. Maldonado's car, but precluding Ms. Maldonado from

impeaching him with evidence of the car's repair estimate. **See** Ms. Maldonado's Brief at 38. Ms. Maldonado claims, without any citations for support, that the "need for expert testimony to explain the relationship between damages sustained by motor vehicles and the injuries suffered by the occupants therein is clear." **Id.** at 39. Ms. Maldonado asserts that Dr. Goldberg was not an expert in automotive repair, biomechanical engineering, or accident reconstruction, but testified that based on his review of the car photographs there was no damage. **See id.** Ms. Maldonado claims that a witness can be impeached to show bias, interest, or corrupt motive, even if that evidence exposes otherwise inadmissible facts to the jury. **See id.** at 40-41.

The trial court explained its rationale for denying a new trial as follows:

> This court finds that Dr. Goldberg's testimony that he did not see any *visible* damage when shown the photographs of the vehicles is not grounds for a new trial, as he simply testified to his opinion while viewing the photographs. Additionally, the jury saw the same photographs several times throughout the trial. Demonstrative evidence such as photographs must be authenticated by evidence sufficient to support a finding that the evidence fairly and accurately represents that which it proports to depict. The photographs of Ms. Maldonado's vehicle were properly authenticated. Further, the court determined at trial that the property damage estimate prepared by Ms. Wismer's claims adjuster were hearsay documents, and therefore, did not allow Ms. Maldonado to present them to the jury.

T.C.O. at 10-11 (internal citations omitted; "Court adjusted to "court").

On direct examination, Dr. Goldberg testified on this issue as follows:

Q. And now there was testimony from Dr. Burke that the trauma from the seatbelt made a direct abdomen trauma and caused a placenta abruption. Do you agree with that?

A. No, I do not agree with that.

Q: And can you talk to the jury about, you know, how the seatbelt would have played with the -- the belly and the uterus in this incident for Ms. Maldonado?

A. Yes. So from reading through the records, the patient was wearing a seatbelt. She was a restrained driver in the car, which is what we recommend. But it was a very low-speed crash. It was -- she was rear-ended. My recollection in looking at the pictures, there's really no visible damage to the cars. I don't believe any repairs needed to be done, and I do not believe the airbags deployed.

N.T., 3/7/25, at 42-43. Ms. Maldonado's counsel then objected, off video, claiming that Dr. Goldberg's testimony was outside the scope of his expertise. *See id.* at 43. Later, during cross-examination, Dr. Goldberg also noted that he had seen the photographs, and there was no significant damage to Ms. Maldonado's vehicle. *See id.* at 127.

We discern no abuse of discretion in allowing this testimony. First, Dr. Goldberg's report stated that he had reviewed photographs of the vehicles, which he reiterated in his testimony. During his testimony, Dr. Goldberg did not provide an expert opinion related to the photographs. He merely stated his observation of the photographs (that there was no visible damage), and his beliefs related to repairs and whether the airbags deployed. The jury was able to review the photographs and observe whether they showed visible damage. Thus, there was no unfair surprise or prejudice by this testimony. *See Daddona*, 891 A.2d at 808 ("No prejudice is apparent from [the expert's]

testimony describing a photograph attached to his report." (citation omitted));

***Cree v. Horn***, 539 A.2d 446, 450 (Pa. Super. 1988), *appeal denied*, 546 A.2d 621 (explaining that the photographs of appellants' car were admissible evidence and could be used to refute the alleged severity of the damages in the absence of testimony by an expert witness. "Our courts have long affirmed verdicts which were based upon a jury's common-sense evaluation of conflicting evidence; minimal physical damage to a vehicle is merely one means by which the evidence is tested." (citations omitted)).

Moreover, Dr. Goldberg testified about the photographs in rebuttal to Dr. Burke's opinion that the seatbelt caused abdominal trauma during the accident and a placental abruption.

As to the vehicle repair estimate, Ms. Maldonado failed to address the trial court's reasoning that it did not admit the estimate because it was hearsay. ***See In re Gillen***, 344 A.2d 706, 525-26 (Pa. Super. 1975) (determining that estimates of repairs for cars were hearsay and did not fall within the business records exception to the hearsay rule). Because she failed to refute the hearsay basis to exclude the estimate, Ms. Maldonado has waived this claim.[7] ***See Heffelfinger, supra; Interest of R.H.***, 320 A.3d 706, 716 (Pa. Super. 2024).

_____

[7] Ms. Maldonado repeatedly asserts that she had the right to impeach Dr. Goldberg on cross-examination to show his bias, interest in the result of the trial, or a corrupt motive. Ms. Maldonado concedes that the repair estimate was prepared by Ms. Wismer's insurance company, but she argues that it
*(Footnote Continued Next Page)*

Additionally, even though Ms. Maldonado was precluded from impeaching Dr. Goldberg with the repair estimate, she cross-examined Dr. Goldberg on his belief that her car did not need to be repaired. *See* N.T., 3/7/25, at 127-30. The jury also heard Ms. Maldonado's own testimony that she was told her car needed repairs. *See* N.T., 3/12/25, at 25. Thus, even if we assume the repair estimate was admissible, we are unpersuaded that Ms. Maldonado was prejudiced by the failure to cross-examine Dr. Goldberg with it. Again, the jury heard from both sides about the damage to the car. Ms. Maldonado's fourth issue merits no relief.

In sum, we discern no abuse of discretion or error of law in the trial court's decision to deny Ms. Maldonado's post-trial motion requesting a new trial based on Dr. Goldberg's testimony.

Judgment affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 6/2/2026

nonetheless may be admitted in connection with agency, ownership or control, or bias or prejudice of a witness. Although Ms. Maldonado cites much case law for the above principles, she fails to explain to us how they apply to Dr. Goldberg so as to warrant a new trial in this case.